796 So.2d 1044 (2001)
Glen E. CURTIS, Appellant
v.
Glenda C. CURTIS, Appellee.
No. 1999-CA-02002-COA.
Court of Appeals of Mississippi.
October 9, 2001.
*1046 Phillip M. Whitehead, Booneville, for Appellant.
Talmadge D. Littlejohn, New Albany, for Appellee.
Before SOUTHWICK, P.J., THOMAS, and IRVING, JJ.
SOUTHWICK, P.J., for the Court:
¶ 1. Glenda C. Curtis was granted a divorce on the ground of adultery by the Itawamba County Chancery Court. Glen E. Curtis appeals, arguing that the court erred in not granting him a divorce on the ground of habitual cruel and inhuman treatment. He also argues that the court erred in the amount of alimony, in its resolution of issues regarding the sale of the marital home, and in awarding attorneys' fees. Finding no error, we affirm.

FACTS
¶ 2. Glen and Glenda Curtis were married in Illinois on June 9, 1962. They later moved to Itawamba County, Mississippi. At the time of the divorce, Mr. Curtis was fifty-seven years old and operated Quality Transmissions, Inc., in which he owned a 43% interest. His net monthly salary from the business was $2,515.49. Mrs. Curtis, who was fifty-three at the time of the decree, draws $389.00 per month in Social Security disability benefits, which she has drawn since 1986. They have two adult daughters.
¶ 3. Toward the end of their marriage, Mrs. Curtis informed Mr. Curtis of substantial debts that she had incurred due to gambling. As a result they refinanced their home to pay off credit cards and other small loans. The couple continued to live together for eighteen months after the discovery of the gambling debts. In March 1997, they separated and Mr. Curtis left the marital home.
¶ 4. Mr. Curtis filed for divorce on the grounds of habitual cruel and inhuman treatment. Mrs. Curtis filed an amended complaint on the same grounds and for adultery. A temporary support hearing was held after which the chancellor awarded temporary alimony and the use of the marital home to Mrs. Curtis. Mr. Curtis was ordered to maintain the mortgage payments.
¶ 5. Due to the family's financial problems, the chancellor later ordered the house to be sold. At the sale a bid of about $103,000 was received from Mr. Curtis's brother. Mrs. Curtis objected on the basis of inadequacy of purchase price and collusion between her husband, his brother and a bank that provided the brother a letter of credit. The chancellor ordered the home again offered for sale along with *1047 a 1.28 acre lot adjacent to the home. In addition, the chancellor ordered Mrs. Curtis to pay the expenses of the second sale if the home did not bring its appraised value ($125,000) or twenty percent more than the bid from the first sale. No bids were offered at the second sale. The bank foreclosed on the home. At a public auction, the bank ended up purchasing the home for $87,500.
¶ 6. Mrs. Curtis was granted a divorce based on her husband's adultery; Mr. Curtis's complaint was dismissed. Alimony was awarded to her of $900 per month. She was also given the 1.28 acre lot adjacent to the former marital home and miscellaneous personal items. Mr. Curtis was ordered to maintain a life insurance policy with his former wife as the beneficiary and to pay $10,000 in her attorneys' fees. He was awarded personal items and his interest in Quality Transmission, Inc.

DISCUSSION

1. Habitual Cruel and Inhuman Treatment
¶ 7. Mr. Curtis argues that he was entitled to a divorce based on habitual cruel and inhuman treatment. The cruelty allegedly arose from his wife's gambling. Her debts created a financial crisis, led to animosity between the couple and damaged Mr. Curtis's mental and physical health.
¶ 8. In Mississippi, gambling has not been found per se to be cruel and inhuman treatment. However, any behavior that becomes addictive or obsessive has the potential to cause problems in relationships. In order to be grounds for divorce, such problems must reach this egregious level:
endangers life, limb or health or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or in the alternative, if the conduct is so unnatural and infamous as to make the marriage revolting to the offended spouse and render it impossible for that spouse to discharge the duties of the marriage, thus destroying the basis for its continuance.
Rawson v. Buta, 609 So.2d 426, 431 (Miss. 1992), citing SHELTON HAND, MISSISSIPPI DIVORCE, ALIMONY AND CHILD CUSTODY § 4-12 (2d ed. Supp.1991). Habitual cruel and inhuman treatment usually must be shown to have been "systematic and continuous," though one significantly violent act may prove the claim. Ellzey v. Ellzey, 253 So.2d 249, 250 (Miss.1971).
¶ 9. Mr. Curtis testified that he became depressed upon discovering his wife's gambling and the debts that she incurred. Their daughters testified that he had lost weight, was not as happy, and often cried after the separation. It also distressed him that Mrs. Curtis was not remorseful.
¶ 10. However distressing Mrs. Curtis's gambling away their security may have been, her actions did not sink to the level of cruel and inhuman treatment as defined by the Mississippi Supreme Court. Life, limb and health were not threatened to such a degree as to warrant a divorce on this ground. The chancellor did not abuse his discretion on this issue.

2. Adultery
¶ 11. Mr. Curtis argues that the court erred in granting the divorce to Mrs. Curtis on the ground of adultery because the chancellor failed to articulate any findings of fact or conclusions of law.
¶ 12. When adultery is alleged, the chancellor "is required to make findings of fact." Holden v. Frasher-Holden, 680 So.2d 795, 798 (Miss.1996). In Holden, there were no findings at all. Nonetheless, *1048 and perhaps because the appellant did not complain about that omission, the court reviewed the evidence and affirmed. Id. Here, Mr. Curtis does complain so the effect of the failure to make specific findings regarding the adultery must be considered.
¶ 13. What we find are several Supreme Court decisions in which it was said that chancellors were "required" to make findings of fact. Holden, 680 So.2d at 798; Brooks v. Brooks, 652 So.2d 1113, 1114 (Miss.1995); McAdory v. McAdory, 608 So.2d 695, 699 (Miss.1992); Dillon v. Dillon, 498 So.2d 328, 330 (Miss.1986). Dillon is the earliest precedent that we have discovered to state this. "Where chancellors make such findings of fact, this Court has consistently held that their decisions will not be set aside on appeal unless they are manifestly wrong." McAdory, 608 So.2d at 699, citing Dillon, 498 So.2d at 330. When the requirement is not met, and it was not met here, what happens next is the question. Two possibilities logically exist. One is to reverse for that reason; the other is for the appellate court to examine the chancellor's decision in a less deferential fashion.
¶ 14. If the chancellor merely adopts the successful party's proposed findings, it has been said in at least one case that the appellate court is to review the evidence de novo. Holden, 680 So.2d at 798, citing Brooks v. Brooks, 652 So.2d 1113 (Miss. 1995). However, that is not the result only when the chancellor adopts a litigant's proposed findings. In McAdory, though the chancellor made some findings, he did not address the issue of infatuation or adulterous nature. McAdory, 608 So.2d at 700. The Supreme Court did not reverse for that reason, but reviewed the evidence and found that it was insufficient on this point. Id.
¶ 15. In Dillon, the chancellor made detailed findings of fact. The court held that when those findings exist, the chancellor will affirm on appeal "unless they are manifestly wrong." Dillon, 498 So.2d at 330. Cited for that proposition was a case that also said that as "to issues of fact where the chancellor made no specific finding, we are required by our prior decisions and by sound institutional considerations to assume that the chancellor resolved all such fact issues in favor of appellee." Id., citing Cheek v. Ricker, 431 So.2d 1139, 1143-44 (Miss.1983). That is potentially important, as it suggests that the absence of findings as to adultery may require a review of the record, but credibility choices and factual disputes are resolved in favor of the decision reached by the chancellor.
¶ 16. As previously mentioned, in one of the more recent cases the chancellor merely adopted the proposed findings of the successful party. Brooks v. Brooks, 652 So.2d 1113, 1118 (Miss.1995).
Under our standard of appellate review, great deference is given to the findings of fact by the chancellor.... The chancellor failed to make his own findings of fact and conclusions of law. Here, the chancellor adopted verbatim and by incorporation, the findings of fact and conclusions of law prepared by a litigant's attorney as those of the lower court.
Where the chancellor adopts, verbatim, findings of fact and conclusions of law prepared by a party to the litigation, this Court analyzes such findings with greater care, Omni Bank [Omnibank of Mantee] v. United Southern Bank, 607 So.2d 76, 83 (Miss.1992), and the evidence is subjected to heightened scrutiny, Matter of Estate of Ford, 552 So.2d 1065, 1068 (Miss.1989). Because the chancellor erred in adopting the litigant's findings of facts and conclusions of law in the case sub judice, the deference *1049 normally afforded a chancellor's findings of fact is lessened.
Brooks, 652 So.2d at 1117-1119. The court may not have meant to say that the chancellor "erred" by adopting proposed findings of one of the parties, because the cited precedents only provided that more intense scrutiny is given the findings. See also Rice Researchers, Inc. v. Hiter, 512 So.2d 1259, 1265-66 (Miss.1987) (Such findings are "entitled to deference, though sensibly not as much as in the ordinary case."). Seven justices concurred in Brooks in order to reject the view that adoption is "error." Brooks, 652 So.2d at 1125 (Roberts, J., concurring). Regardless, the chancellor's failure to make independent findings but instead adopting a party's proposals at least is not reversible error. It only lessens the deferential nature of review.
¶ 17. A more recent case interpreted Brooks in a manner helpful to this appeal:
Where allegations of adultery are raised as grounds for divorce, the chancellor is required to make findings of fact. McAdory v. McAdory, 608 So.2d 695, 699 (Miss.1992); Dillon v. Dillon, 498 So.2d 328, 330 (Miss.1986). This Court will not set aside such findings on appeal unless they are manifestly wrong. Id. Where the chancellor has failed to make his own findings of fact and conclusions of law, this Court will "review the record de novo." Brooks v. Brooks, 652 So.2d 1113, 1118 (Miss.1995)(chancellor did not make his own findings, rather adopted litigant's findings and applied wrong legal standard). Holden, 680 So.2d at 798.
There is no distinction in this excerpt, nor do we find reason to make one, between a chancellor's failure to make any findings at all and the failure to "make his own findings" about adultery. Since adopting a litigant's proposed findings forces the court to look at the record de novo, the failure to adopt any specific findings should be seen as leading the appellate court to the same task.
¶ 18. We find no precedent in which the Supreme Court reversed simply because of the absence of specific findings of fact on adultery. Some cases have been reversed because a request was denied by one of the parties for detailed findings under Mississippi Rule of Civil Procedure 52. E.g., Lowery v. Lowery, 657 So.2d 817, 819 (Miss.1995) (cruel and inhuman treatment divorce).
¶ 19. We conclude that the effect of a failure to make findings on adultery is to remove the deferential nature of the review. Instead of affirming unless we find that the chancellor was manifestly in error, we are to review the evidence de novo but making reasonable credibility choices in a manner consistent with the judgment entered by the chancellor.
¶ 20. Adultery may be proven by demonstrating an adulterous inclination and an opportunity to consummate the inclination. Owen v. Gerity, 422 So.2d 284, 287 (Miss.1982). An inclination may be shown by either an infatuation with a particular person or a general adulterous propensity. McAdory v. McAdory, 608 So.2d 695, 700 (Miss.1992). Although direct evidence is not required, the evidence must be clear and convincing. Brooks v. Brooks, 652 So.2d 1113, 1116 (Miss.1995).
¶ 21. We divide the evidence regarding adultery into two sections, the first on the opportunity for adultery, and secondly, Mr. Curtis's infatuation with the alleged paramour or his general adulterous inclination.

Opportunity
¶ 22. Glen Curtis stated that Ella Reece Adams was a sales person at Trans Mart, Inc., the company from which Curtis *1050 purchased parts for his business. Curtis began traveling to Florence, Alabama, where Adams was located to pick up parts for his business after United Parcel Service workers went on strike. The strike occurred sometime in September of 1997, but Curtis continued to stay at Adams' house until sometime in early January 1998. Curtis claims he paid Adams $800 a month in rent and for the use of Adams' automobile. Curtis stated he paid Adams in cash and had no documentation that the rent was paid. Curtis admitted that he spent the night at Adams' home the Monday night before a court hearing on March 5, 1998. Adams' house had three-bedrooms.
¶ 23. Mr. Curtis denied having sexual relations with Adams. He testified that he stayed with Adams to escape "all the hullabaloo that was going on around here." Curtis stated that he spent the night at Adams' house during the course of the trial proceedings and that he was in a bowling league with Adams' son.
¶ 24. A private investigator testified that he observed Mr. Curtis at the Adams home in Alabama. The investigator saw that Mr. Curtis' car remained at the Adams home overnight. Another private investigator stated that he observed Curtis and Adams walking together and in Adams' dining room. He photographed and videoed Curtis and Adams, including capturing pictures of Curtis hanging Christmas lights outside the home. Mr. Curtis admitted that he spent Christmas with Adams and that his daughter, Sherry, arrived there after Christmas.

Infatuation/Inclination
¶ 25. It was suggested that Mr. Curtis was simply awaiting his divorce in order then to marry Mrs. Adams. Mrs. Curtis testified that "I had heard through the grapevine that my granddaughter had been up there and said he would marry this lady if he was divorced." That is hearsay and unusable on the issue of infatuation. Mrs. Curtis also stated on cross-examination that she started suspecting adultery "around August, or September, somewhere in there." When asked if she had any idea why Mr. Curtis left the marriage, Mrs. Curtis stated "I figure it was the other woman now." The only reason Mrs. Curtis gave for suspecting adultery was that "I knew he acted different." When asked whether she knew Mr. Curtis was having an affair after the separation, Mrs. Curtis stated that "I hadin the back of my mind, I kind of figured it. I mean, why would he leave and go off somewhere and not let anybody know where he was at?"
¶ 26. Also in evidence was that Mr. Curtis did not inform others that he was living at Ms. Adams' house. He testified that until he called his daughter in January of 1998 to tell her he was again living at his mother's house back in Mississippi, that "I hadn't told anybody where I was at," but "I didn't try to keep it a secret, sir." A private investigator testified that he did not see Mr. Curtis and Ms. Adams express any affection towards one another or hold hands when they went walking on several occasions.
¶ 27. Both spouses testified that Mr. Curtis had years earlier admitted to his wife a 1965 episode of adultery. The chancellor stated "if he did this back in 1964, he would have an inclination to do it again should the right circumstances arise." The chancellor further stated that "I'm permitting you to amend your answer to plead condonation over Mr. Littlejohn's objection, but opportunity and inclination could certainly be in place in this situation; that is, the Florence, Alabama, situation."
¶ 28. Therefore, the evidence before the chancellor established that after Mr. Curtis moved out of the marital home, he *1051 began living with another woman. Mr. Curtis denied that adultery occurred, but admitted that he spent the night on several occasions and paid rent for a separate bedroom. He spent time with the woman, and did not just stay at her house. This is direct and powerful evidence of opportunity, but only circumstantial evidence of infatuation. That Mr. Curtis had an admitted affair thirty years earlier is of very limited weight to his adulterous inclination. The long passage of time without any other affairs insofar as the evidence reveals makes this almost equally supportive that he did not have an adulterous inclination.
¶ 29. The chancellor at the close of the trial stated that he did not believe that there was meaningful evidence of adultery before the parties separated but he did find that if the adultery occurred, it was after separation. He informed the parties that he would deliberate the questions, but also wanted them to present legal memoranda on whether post-separation adultery was sufficient as a grounds for divorce.
¶ 30. Recalling that we are reviewing the evidence de novo but allowing credibility choices to be consistent, if reasonable, with the chancellor's decision, we conclude that the circumstantial evidence of adultery was sufficiently strong to support the grant of the divorce. Mr. Curtis lived for several months with a woman not his wife, without informing his family or others of his location. Mr. Curtis and Mrs. Adams were seen to spend time together, including what might otherwise be considered to be intimate family gatherings such as for Christmas. True, there were no displays of affection seen by the investigators or others. We do not deny that Mr. Curtis may have been honoring his vows to his wife and have been friendly with but did not engage in sexual relations with Mrs. Adams. Nonetheless, we find that the reasonable view of this evidence was that adultery was occurring.
¶ 31. There is little or no evidence that the adultery arose before the parties' separation. However, the Supreme Court has noted that "[n]othing in our jurisprudence requires that a ground for divorce, such as adultery, arise before separation." Talbert v. Talbert, 759 So.2d 1105, 1110-111 (Miss.1999). Though the Talbert court stated the point somewhat conditionally, we have found no authority to require that the adultery must precede the separation. It is only necessary that it precede the divorce. The possibility of reconciliation exists during a separation. Post-separation acts such as this can as effectively and directly end the prospects for a continued marriage as can any acts committed before separation.

3. Alimony
¶ 32. Mr. Curtis argues that the court erred in requiring him to pay permanent periodic alimony in the amount of $900 per month and requiring him to maintain a life insurance policy for the benefit of his former wife.
¶ 33. Alimony awards will not be reversed unless the chancellor committed manifest error or abused his discretion, as the awards are within the chancellor's discretion. Powers v. Powers, 568 So.2d 255, 257 (Miss.1990). To determine the amount of permanent alimony, the chancellor must consider twelve factors identified in Armstrong v. Armstrong, 618 So.2d 1278, 1280 (Miss.1993). The goal is to balance the reasonable needs of the wife "with the right of the husband to lead as normal a life as possible with a decent standard of living." Gray v. Gray, 562 So.2d 79, 83 (Miss.1990).
¶ 34. The chancellor is required to consider the Armstrong factors, *1052 but if he fails to make an on-the-record analysis of them all, it is not fatal. Selman v. Selman, 722 So.2d 547, 554 (Miss. 1998). The chancellor did not specifically address all of the factors. He mentioned both parties' ages, income and health. He considered Mrs. Curtis' wasteful dissipation of the marital assets due to her gambling, but found that she is disabled and has no means to gain employment. She receives only $389 per month, less $43 for her Medicare premiums. She is unable to support herself without the receipt of alimony.
¶ 35. On the other hand, Mr. Curtis receives a net monthly income of $2,515.49 from his services and investment in his business. Mrs. Curtis received no part of her husband's 43% interest in his business. Mr. Curtis testified that he had expenses per month totaling $3,018.17. That included the $1,045.33 per month mortgage payment which is no longer relevant as the house was lost at foreclosure. Even though $900 per month is a large percentage of his actual income, compared with her income the amount is not so high as to warrant reversal or modification.

4. Sale and division of property.
¶ 36. The chancellor ordered the marital home to be sold at a public auction. Mr. Curtis' brother bid $103, 319.41, the payoff amount for the mortgage. Mrs. Curtis objected to confirmation of the sale, alleging collusion between Mr. Curtis, his brother and the bank. The chancellor found that the bid was inadequate as the home was appraised at $125,000. Mr. Curtis argues that the chancellor erred in failing to confirm the sale of the marital home and, failing that, not requiring that Mrs. Curtis post a bond in order to object to the sale. Mr. Curtis further argues that the chancellor erred in failing to require the smaller adjacent lot to be sold along with the marital home.
¶ 37. By statute, "[t]he party who objects to a sale under a decree because of inadequacy of bid, or any person interested therein, may prevent the confirmation thereof by entering a bond ..." in sufficient amount. Miss.Code Ann. § 11-5-109 (Rev. 1991). Here, the chancellor did not require Mrs. Curtis to post a bond. That is unfortunate considering the later events, which resulted in significantly less money being obtained from the property. The problem now is in fashioning a remedy. The time to gain a bond for protection was prior to the time that the old bid was rejected. No bond can be obtained now to protect against the contingency that has already occurred. What further Mr. Curtis' attorney could have done to demand a bond is not for us to analyze. Perhaps whatever was attempted would have been unsuccessful. Regardless, there is no fund to use now to address the shortfall from this original bid and the amount received for the property later.

5. Separate lot
¶ 38. Mr. Curtis argues that his former wife should not have been awarded title to a vacant lot adjacent to the property on which their marital home was located. He argued that the bank would have taken the lot in satisfaction of the deficiency between the foreclosure sales price and the amount owed on the home. Among the problems allegedly created is that the sewer line for the home and other needed easements are on this vacant lot, but no retention of easements occurred for the benefit of the property on which the house sits.
¶ 39. There is unlikely to be a perfect manner to divide up real and personal property at the time of divorce. Though there were advantages identified by Mr. *1053 Curtis to having the vacant lot kept in common ownership with the former marital home, there were also advantages to Mrs. Curtis in getting this piece of property. There is no proof that this specific distribution of property made the overall distribution inequitable, even if for various reasons Mr. Curtis would have profited by gaining title or having it used to satisfy the debt to the bank.
¶ 40. We find no abuse of discretion by the chancellor on this issue.

6. Attorneys' fees
¶ 41. In the final order, Mr. Curtis was ordered to pay $10,000 of Mrs. Curtis' $20,488.70 request for attorneys' fees. Mr. Curtis claims the chancellor erred in awarding this amount considering that Mrs. Curtis had already paid her attorneys $6,000, evidencing her ability to pay. Mrs. Curtis testified that she borrowed money in order to pay the fees and is unable to pay any more.
¶ 42. A party must demonstrate an inability to pay his or her attorney at the time of divorce before the other spouse can be ordered to make some contribution. Jones v. Starr, 586 So.2d 788, 792 (Miss. 1991). Considering the financial situation of both parties, we are unable to say that the chancellor abused his discretion in awarding $10,000 in attorneys' fees to Mrs. Curtis.
¶ 43. THE JUDGMENT OF THE CHANCERY COURT OF ITAWAMBA COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., THOMAS, LEE, MYERS, and CHANDLER, JJ., concur.
KING, P.J., dissents with separate written opinion joined by BRIDGES and IRVING, JJ.
BRANTLEY, J., not participating.
KING, P.J., Dissenting:
¶ 44. Because I believe the majority misinterprets and misapplies the law on the matter of adultery, I dissent.
¶ 45. The majority opinion first agrees with Mr. Curtis that in divorce actions founded upon allegations of adultery, the chancellor "is required to make findings of fact." Having agreed with Mr. Curtis that this is a divorce action predicated upon adultery, and that therefore the chancellor was "required to make findings of facts," the majority then sets out by circumnavigation to suggest that this requirement is something less than mandatory.
¶ 46. The first vehicle used by the majority for this purpose is McAdory v. McAdory, 608 So.2d 695 (Miss.1992). In paragraph 14 of its opinion, the majority states:
In McAdory, though the chancellor made some findings, he did not address the issue of infatuation or adulterous nature. McAdory, 608 So.2d at 700. The Supreme Court did not reverse for that reason, but reviewed the evidence and found that it was insufficient on this point. Id.

¶ 47. That statement gives a false picture of what occurred in McAdory.
¶ 48. The majority correctly states that the supreme court did not reverse McAdory. However, that fact is not a source of comfort or support for the majority position.
¶ 49. The chancellor granted Mr. McAdory a divorce on the grounds of (1) adultery and (2) irreconcilable differences. Because the divorce was granted on dual grounds, there was no reason to reverse and remand that portion of the action *1054 predicated upon adultery. Indeed, this fact was recognized by the supreme court when it said:
The reversal on the charge of adultery does not affect the entire divorce decree or the McAdorys' marital status. The court also granted James a divorce on the ground of habitual cruel and inhuman treatment. Kimberly does not assign that as error. Thus, that part of the decree remains intact and the parties remain divorced. McAdory, 608 So.2d at page 701.
¶ 50. The majority continues its circumnavigation by citing Cheek v. Ricker, 431 So.2d 1139, 1143-44 (Miss.1983), where the following is found:
With respect to issues of fact where the chancellor made no specific findings, we are required by our prior decisions and by sound institutional considerations to assume that the chancellor resolved all such fact issues in favor of appellee.
¶ 51. The majority infers that the above quoted language can be viewed as making the requirement of specific findings as to adultery less than mandatory. Such an assertion is a matter of very flawed logic, and therefore results in an incorrect conclusion. It is flawed for two reasons.
¶ 52. The first reason, is that Cheek was a child custody modification case, as opposed to a divorce predicated upon the grounds of adultery.
¶ 53. The second reason, is that Cheek was decided in 1983. It preceded by three years Dillon which was decided in 1986. It was in Dillon v. Dillon, 498 So.2d 328 (Miss.1986), that the supreme court first required that the chancellor make specific findings in divorce actions predicated upon adultery.
¶ 54. If the supreme court had intended for Dillon to be advisory rather than obligatory, it could have embraced Cheek when it decided Dillon. It did not do so. We must, therefore, conclude that the Dillon mandate was in fact intended to be obligatory.
¶ 55. The majority completes its circumnavigation by stating there is no difference in a chancellor's failure to make findings altogether and adopting the findings of one of the parties. Such an assertion is likewise flawed. It is analogous to saying there is no difference in someone who is dead and someone who is merely ill. Beyond question such an assertion would be immediately exposed as incorrect.
¶ 56. The majority has circumnavigated this issue and, of necessity, returned to its point of beginning. That point is this, in a divorce predicated upon the issue of adultery, the supreme court has required that the chancellor make specific findings of fact.
¶ 57. The American Heritage Dictionary, 3rd Edition, defines "required" as: (1) needed, essential, (2) obligatory.
¶ 58. Because specific findings in this case are obligatory and because the chancellor failed to make them, I would, at a minimum, remand for the appropriate findings.
BRIDGES and IRVING, JJ., join this opinion.