IRVING, J.,
for the Court.
¶ 1. James Parker and Nancy Carolyn Parker agreed to and were granted an irreconcilable differences divorce. Because they could not agree on how to divide their property, they requested that the Itawamba County Chancery Court make an equitable division of their estate. Feeling aggrieved by several aspects of the court’s division, James appeals and asserts that the court erred in (1) ordering a judicial sale of the parties’ marital assets, (2) classifying a number of properties as marital assets, (3) ordering James tc pay Nancy for the difference in the value of properties that he disposed of in contravention of a court order, (4) fading to credit James for payment of debts owed on the marital property, (5) awarding Nancy attorney’s fees, and (6) failing to make adequate findings regarding an equitable distribution of the marital estate.[1]
¶ 2. We affirm as to all issues except attorney’s fees, which we reverse and render.
FACTS
¶ 3. James and Nancy were married on September 2, 1992. It was Nancy’s third marriage and James’s sixth. Although James and Nancy each had children from previous relationships, they had no children together. On December 11, 2002, Nancy filed for divorce. On the same day, *326 the court entered an emergency order forbidding the parties from disposing of marital property, including several businesses owned by James and Nancy. The parties were granted a divorce on the basis of irreconcilable differences and the court proceeded to conduct an equitable distribution of the marital estate.
¶4. Despite the court’s order, James disposed of several piece's of marital property, including one of the jointly-owned businesses. James also leased property to a third party with an option to purchase. James did not share any of his profits from these disposals with Nancy. At trial, neither party provided the court with an accurate and up-to-date appraisal of the majority of the marital estate. At a hearing on May 12, 2005, the court informed the parties that if they could not come to an agreement before June 15, 2005, the court would conduct a judicial sale of all of the marital property due to the insufficient evaluations before the court. The court also gave the parties time to file additional information with the court. Despite the allowance, the parties did not come to an agreement as to the value of the marital estate, nor did either party attempt to present the court with an up-to-date evaluation. James filed an interlocutory appeal requesting a termination of the judicial sale, but the Mississippi Supreme Court denied the request.
¶ 5. Consequently, all of the marital estate-including the businesses-was sold at judicial sale. The sale netted $296,512.66, of which James received $35,681.33 and Nancy received $260,831.33. The chancellor made this division by splitting the marital proceeds equally and then reducing James’s award because of his disposal of marital property. Nancy’s share of the award increased proportionally. The chancellor also awarded Nancy ten thousand dollars in attorney’s fees, which was paid to her from James’s proceeds.
¶ 6. Additional facts, as necessary, will be related diming our analysis and discussion of the issues.
ANALYSIS AND DISCUSSION OF THE ISSUES

1. Propriety of Judicial Sale

¶ 7. James claims that the chancellor erred in ordering a judicial sale of the marital property. James admits that his argument is moot, as the property has already been sold and cannot be unsold. However, he urges us to consider this issue due to the impact that it may have on future cases. We recognize the importance of this issue and the impact it may have in the future, regardless of the fact that it is now moot for these parties. Accordingly, we address the merits of James’s complaint.
¶ 8. After a diligent search, we have found no Mississippi case law pertinent to the question before us: whether a court may order a judicial sale of the marital estate after being given inadequate evaluations by the parties. For guidance, we turn to the law regarding partition of property. The Mississippi Supreme Court has stated that partition in kind is the preferred method of partitioning jointly-owned property. Fuller v. Chimento, 824 So.2d 599, 601(¶ 8) (Miss.2002). Furthermore, a partition sale is appropriate only where (1) doing so is better for the parties involved than a partition in kind, or (2) the property is incapable of being equally divided. Id. at 601-02(¶ 9). Notably, “a court has no right to divest a cotenant landowner of title to his property by sale over his protest unless these conditions are fully met.” Id. at 602(¶ 9) (citing Shorter v. Lesser, 98 Miss. 706, 711-12, 54 So. 155, 156 (1911)).
*327 ¶ 9. Nothing in the record indicates that a partition sale was in the parties’ best interest or that the property at issue was incapable of being equitably divided in kind. In fact, the chancellor did not address either of the above when ordering a judicial sale of the property; rather, he focused exclusively on the fact that the parties had provided inadequate evaluations of the marital estate. We note that a chancellor has the power to order an evaluation of the marital estate. Although moot in the case before us, as the property has been sold, we urge chancellors in the future to order an evaluation rather than resorting to a judicial sale of marital property.

2. Classification as Marital Property

¶ 10. “Marital” property is “any and all property acquired or accumulated during the marriage.” Stewart v. Stewart, 864 So.2d 934, 937(¶ 12) (Miss.2003) (quoting Hemsley v. Hemsley, 639 So.2d 909, 915 (Miss.1994)). “Separate property that has been ‘commingled with the joint marital estate’ also becomes marital property subject to equitable distribution.” Id. (quoting Johnson v. Johnson, 650 So.2d 1281, 1286 (Miss.1994)). We will reverse a chancellor’s characterization of property only when his findings are clearly erroneous. Id. at 938(¶ 13). We assume “that the contributions and efforts of the marital partners, whether economic, domestic, or otherwise are of equal value.” Johnson v. Johnson, 823 So.2d 1156, 1161(1111) (Miss. 2002) (quoting Hemsley, 639 So.2d at 915).

a. Three Acres Given by the Digbys

¶ 11. On August 3, 1993, Charles and Eunell Digby deeded three acres contiguous to the Parkers’ eighty-five acre marital estate to James. The land was apparently given in return for James’s clearing of some land owned by the Dig-bys. James contends that “the above property was a gift to him during the marriage, and as such was not subject to equitable distribution....”
¶ 12. There is no evidence in the record to suggest that the property in question was not commingled with the marital estate. In fact, it is clear that the tract adjoined acreage that was part of the marital property. There is no evidence that Nancy was not allowed full use and access to this part of the marital estate. Therefore, we cannot find that the court was clearly erroneous in finding that the three acres were part of the marital estate.

b. James’s One-Half Interest in the Marital Estate

¶ 13. Prior to his marriage to Nancy, James owned a one-half interest in the approximately eighty-five acres upon which the marital abode is situated. James’s ex-wife, Donna Parker, and James’s brother-in-law, Robert Hood, owned the other one-half interest in the property. Hood quitclaimed his interest to James. On July 8, 1994, James and Nancy paid Donna $12,600 for her interest in the property. Nancy testified that the loan taken out to pay Donna was paid from a personal account that was jointly shared by Nancy and James during their marriage. Nancy further testified that the money from the joint account came from their separate paychecks. Therefore, it is clear that the one-half interest purchased from Donna was marital property, as it was commingled and shared by Nancy and James.
¶ 14. James, however, argues that his one-half interest that he owned prior to the marriage should have been considered separate property. He concedes that the marital home and the 10.4 acres surrounding the home became marital property; nevertheless, he contends *328 that his one-half interest in the seventy-five or so remaining acres should have been considered as non-marital property. Our review of the record supports the chancellor’s determination. It is clear that at least one-half of the property that James complains of was clearly commingled, as Nancy helped pay off the loan that was used to purchase the property. There is no indication that the remaining one-half was somehow kept separate. Notably, Nancy testified that James still owed money on his interest at the time of their marriage and that she helped him “finish paying it....” In the absence of any evidence showing that the one-half interest that James brought into the marriage remained separate, the chancellor’s findings are not clearly erroneous.
¶ 15. As support, James cites Hemsley for the proposition that absent evidence of commingling, the one-half interest that he brought into the marriage should have remained his separate estate. Hemsley provides that “[a]ssets acquired or accumulated during the course of a marriage are subject to equitable division unless it can be shown by proof that such assets are attributable to one of the parties’ separate estates prior to the marriage or outside the marriage.” Hemsley, 639 So.2d at 914 (emphasis added). Although the interest was acquired prior to the marriage, Nancy testified that she helped James to pay off the balance owed on the one-half interest that he brought into the marriage. Therefore, the one-half interest was ultimately accumulated during the course of the marriage. This assertion of error is without merit.
c. Built-Up Equity
¶ 16. Prior to his marriage to Nancy, James owned and ran Parker’s Quick Lube 1. However, James later lost control of the shop, and it was foreclosed on. After his marriage to Nancy, James was able to repurchase Quick Lube 1. It is clear that the business itself is marital property, as Nancy helped James pay for his repurchase of the shop. However, James contends that he should have been given credit for establishing and building up equity in Quick Lube 1.
¶ 17. Even if we could consider the establishment of the business to be a separate, countable asset, it is clear that whatever equity existed in Quick Lube 1 was commingled with the marital estate after James’s marriage to Nancy. Nancy helped James run Quick Lube 1 and all of James’s other stores, which were purchased with proceeds from Quick Lube 1. Any tangible asset that James had separate from Nancy prior to the repurchase was obviously commingled with the marital estate. The chancellor did not err in refusing to give James credit for any separate goodwill in Quick Lube 1.

3. Order to Pay Difference in Property Values

a. Quick Lube 3

¶ 18. James argues that the court erred in ordering the clerk to deduct from James’s portion of the marital estate the difference between the stipulated value of Quick Lube 3 and the amount for which James sold it to Susie Grissom and Ralph Owen. There is no doubt that the business was marital property. There is also no doubt that James transferred it in clear contravention of a court order preventing the disposal of marital property. Grissom testified that she plotted with James to prevent Nancy from receiving her share of marital property. The parties stipulated that the shop was worth $145,000. Had James not improperly disposed of the property, it would have been sold at judicial sale, as the parties did not stipulate to its value until after the judicial sale. *329 James contends that he disposed of the property because he was in danger of losing the business. Given the court order prohibiting the disposal of marital property, James should have approached the court before disposing of the shop. We cannot find that the court erred in ordering James to pay Nancy one-half of the stipulated value of the shop, as she received none of the proceeds from James’s sale of the shop.

b. House and S.01 Acres

¶ 19. On January 3, 2003, James conveyed a house and 3.01 acres to Jimmy Parker and Barbara Parker, from whom he had purchased the property in 1997 at a cost of twenty-six thousand dollars. James contends that “[t]here is no evidence that [he] received any benefit from this transfer, other than debt relief.” Be that as it may, James clearly conveyed the property in direct contravention of the court’s order to the contrary. There is no evidence that Nancy received any compensation for the property prior to the court’s judgment, even though the property was purchased using marital funds. We cannot find that the court erred in ordering James to pay Nancy one-half of the appraised value of the property in response to his improper disposal of it.
c. Quick Lube 2
¶ 20. In contravention of the court’s prohibition on disposal of marital property, James leased Quick Lube 2 to Jerry Enis with an option to purchase the property at some future date. There is no evidence that suggests that Enis was aware of the court’s order, preventing disposal of the property, before he entered into the contract with James. At the judicial sale of the property, Enis arrived and declared to the potential buyers that he had a lease with an option to purchase on the property. Thereafter, no other bids were taken on the property, and Enis bought it for $55,850, $44,150 below the appraised value of the property. In compensation for the reduction in value, the court ordered James to pay Nancy $22,075 out of his share of the marital estate, which represents one-half of the difference between the amount garnered at the judicial sale and the appraised value of the business. Given that James leased the property to Enis in direct contravention of the court’s order and that the improper lease had a significant chilling effect on bidding on the property at the judicial sale, we cannot find that the court erred in ordering James to pay Nancy for the reduction in value.
A Failure to Credit Debts Paid
¶ 21. James contends that the chancellor erred in failing to address marital debts that were paid by him after his separation from Nancy but before the court’s judgment. James admits that most of these debts were paid by a loan that was secured by marital property. Therefore, Nancy was responsible for half of the loan, as it was secured by marital property. More troubling is James’s assertion that he also paid marital debts with funds from his monthly retirement benefit, which is a non-marital asset. Having reviewed the record, we note that the only evidence that James paid for marital debts with his retirement funds is his own testimony to that effect. In fact, his testimony did not establish how many times he paid money from his retirement benefits nor how much money he paid in total. Therefore, we find that there was insufficient evidence for the chancellor to credit James for his payments from his retirement account.

5. Attorney’s Fees

¶ 22. James claims that there was insufficient evidence supporting an *330 award of attorney’s fees and that Nancy was financially capable of paying her attorney’s fees. We agree. The chancellor wholly failed to address any factors or what considerations prompted him to award attorney’s fees to Nancy. Furthermore, we find that Nancy was clearly able to pay her attorney’s fees, as the court awarded her nearly $261,000 as part of its judgment. Nancy acknowledges this, but argues that she “currently has no assets except for her retirement check of $731 per month.” We disagree, as it is unclear what a judgment in her favor in the amount of $260,831.33 could be other than an asset. Nancy lists a number of facts that she contends the chancellor must have looked at when making his award of attorney’s fees, but we note that the chancellor’s own opinion is silent as to why he chose to award Nancy attorney’s fees despite her obvious ability to pay the fees out of her portion of the marital estate. Despite the discretion afforded chancellors in such matters, we find that the court erred in awarding Nancy the ten thousand dollars in attorney’s fees without further discussion when she was clearly able to pay her fees. Accordingly, we reverse and render the court’s award of attorney’s fees.

6. Failure to Make Adequate Findings

¶23. In addition to raising the adequacy of the chancellor’s findings in general, James also specifically complains that the chancellor did not address the one-half interest that he owned in the marital estate prior to his marriage to Nancy and that the chancellor did not discuss the equity and work that James had put into establishing the Quick Lube business.
¶ 24. In Johnson, 823 So.2d at 1161(¶ 12), the Mississippi Supreme Court described what sort of findings a chancellor must make pursuant to Ferguson v. Ferguson, 639 So.2d 921 (Miss.1994):
The chancellor’s order in this case fails to make the specific findings of fact and conclusions of law in regards to the Ferguson factors of equitable distribution. The chancellor’s opinion states that “the first analysis that is required under Ferguson v. Ferguson ... is a determination of ‘marital assets’ or ‘marital property’.” The opinion later states that “in Ferguson, the Court outlined the factors to be considered in the equitable distribution of properties,” and then proceeds to list the enumerated factors of the Ferguson analysis. The trial court then proceeds, with a cursory explanation of factual factors considered, to classify the major items of the parties as either marital or nonmarital assets. In its references to the trial testimony in the case, the court failed to clearly state which Ferguson factor the evidence supports. Its findings of fact on the record merely go to the classification of the property as marital, it does not instruct this Court as to which factors the trial court found helpful in performing an equitable division of the property. This failure to make findings of fact and conclusions of law to justify its division of the property, as required by Ferguson ..., requires reversing and remanding for the trial court to make findings of fact on the record.
¶ 25. For purposes of thoroughness, we quote at length from the court’s bench opinions, which were incorporated into its final judgment:
The division of marital assets is now governed under the law as stated in the case of Hemsley v. Hemsley, 639 So.2d 909, decided in 1994, and, interestingly enough, in the same year, the court decided the case of Ferguson v. Ferguson, 639 So.2d 921. First, the Court has to determine the character of the parties’ assets, marital or nonmarital. This de *331 termination must be made pursuant to Hemsley. The marital property is then equitably divided, employing the Ferguson factors as guidelines, in light of each party’s nonmarital property.
⅜ ⅜ ⅜ ⅜
Now the question then gets to us as to what equitable distribution is to be made of the marital property. The Ferguson case addressed that point. The case that I mentioned to you, the Lauro[2] case, which is the most recent case that defines for us again and reemphasizes those findings [,] set out these again.... “Although this listing,” the court said in Lauro, “is not exclusive, this Court suggests the chancery courts consider the following guidelines, where applicable, when attempting to effect an equitable division of marital property.” And these are as follows, gentlemen, that this Court is to consider.
1. Substantial contribution to the accumulation of the property. What are the factors under that item one? Those factors to be considered in determining that contribution are as follows:
“The direct or indirect economic contribution to the acquisition of the property.” This Court finds that the wife made such a contribution, either directly or indirectly in this case.
“Secondly, the contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage.” This Court notes that this was a marriage of some 15 years, approximately, or 11 years, I’m sorry. And the Court further notes in that particular point that this marriage began to deteriorate in 2002 after James began to camp out at Sardis with one Tish Todd, with whom he admitted having sexual intercourse, albeit after the December 11, 2002, separation of the parties. But that factor has to be factored into another issue here.
And even though they are contending this happened after the separation, there is a case styled Curtis v. Curtis, 796 So.2d 1044, where that point was raised on the appeal to the court of appeals. Here, adultery was the ground for divorce in that case. I realize we’re going off here on irreconcilable differences. But the point I’m getting at is here, the point that was raised that this occurred, this alleged adultery which was proven to the satisfaction of the Court in the instant case, occurred after the separation. The Curtis ease pointed this out to us. “There is little or no evidence that the adultery arose before the parties’ separation. However, the supreme court has noted that nothing in our jurisprudence requires that a ground for divorce, such as adultery, arise before separation.”
Now, what happened in the Curtis case was we didn’t have enough evidence, and I say “we” because I tried that case. I represented Mrs. Curtis in that case that came out of this very county. It went to the supreme court. Judge Thomas granted her a divorce on the grounds of adultery, but it occurred after the separation.
⅜ ⅜* ⅜ *{«
Now, the net result of that is the point I’m making here that the court said in Curtis, reiterating what it had already said in Talbert, 759 So.2d 1105, that “Though the Talbert court stated the point somewhat conditionally, we have found no authority to require that the adultery must precede the separation. *332 It is only necessary that it precede the divorce,” that is, the trial of this case on March 31, 2005.
[[Image here]]
Now, the record also reveals that James had an inappropriate sexual relationship, this Court finds, with one Rhonda Co-wan, who suffers from Noonan Syndrome. And the Court further finds that James is living with one Cindy Pin-dergraft. Although James denies any inappropriate sexual activity in his current living situation, this Court finds that unbelievable and so finds that he has been carrying on a relationship with her.
I mention that to point out one of the points here as to any contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage that James has certainly undermined the marriage with that situation.
The “c” factor under No. 1 of the Ferguson factors is any contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.
Factor No. 2 under Ferguson, “The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.” The Court notes here that James disposed of some marital assets after this Court had entered an order prohibiting such. And this Court will hold James accountable in any equitable distribution based upon his violation of that court order in the making of any equitable distribution ultimately of these marital assets.
Thirdly, the market value and the emotional value of the assets subject to distribution. Now, gentlemen, except for Exhibits 8 and 9, you have given this Court no guidance as far as how we are to divide those marital assets. You have got two separate appraisals that are out of date. One of them is seven years old; one of them eleven years old. And the Court finds they are totally inadequate to give this Court any guidance as to how these marital assets should be evaluated.
The 8.05s furnished give some minimal direction to the Court insofar as evaluation of assets. But they too are totally insufficient under Ferguson for this Court to make a proper division of the marital assets.
Number four under Ferguson, Factor No. 4, the value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse.
The fifth factor: Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution. There have been some debts incurred as reflected in some of these exhibits to which I have already referred that will have to be dealt with in this matter and those liens will have to be taken care of to that extent.
Item 6: “The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties.”
Item 7: “The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity.”
Item 8 under Ferguson: “Any other factor which in equity should be consid *333 ered.” And that’s the catch-all here or the let-out, I call it, to the chancellors. Now, in further commenting on this matter of equitable distribution, the word “equitable” does not mean equal under our case law. In making an equitable distribution of marital property, the chancellor is not required to divide the property equally. This was set out in the 1997 case of Love v. Love, 687 So.2d 1229, that followed by three years Ferguson and Hemsley. The case was also noted of the point in Trovato v. Trovato, 649 So.2d 815, in the year 1995. The basic point was set out though in the holding of Bullock v. Bullock, 699 So.2d 1205, which came out the same year that Love came out in 1997, that the goal of equitably distributing marital property is, quote, not only a fair division upon the facts of the case but also an attempt to finalize the division of assets and conclude the parties[’] legal relationship, leaving them each in a self-sufficient state where the facts and circumstances permit total dissolution, close quote. And that case quoted the Ferguson case that I have already identified.
Now, with that said and done, the Court having considered all of this as to equitable distribution, the question then is how will it be divided.
Thereafter, the court told the parties that it was going to hold a judicial sale to determine the value of the marital estate due to the wholly inadequate estimations provided by the parties. When the parties failed to come to an agreement regarding the value of the marital estate, the estate was sold at a series of judicial sales. On June 21, 2006, the court rendered its final opinion from the bench. The chancellor stated as follows:
This Court alluded to Ferguson in its opinion that was rendered by this Court as filed in this cause on May 23, 2005, and readopts herewith the applicability and explanation of those Ferguson factors as set forth in that opinion delivered on that day. The factors again though that I emphasize for consideration here are:
1. The substantial contribution of the accumulation of the property. The factors to be considered in determining contribution are as follows: One, direct or indirect economic contribution to the acquisition of the property; two, contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and, three, contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.
2. Back to the original factor under Ferguson. The degree in which each spouse has expended, withdrawn, or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree, or otherwise. That factor was dealt with in this Court’s opinion as submitted on May 23, 2005, and the Court has noted that with emphasis in this case.
3. The market value and the emotional value of the assets subject to distribution.
4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse.
5. The tax and other economic consequences and contractual or legal consequences to third parties of the proposed distribution.
*334 6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties.
7. The needs of the parties for financial security with due regard to the combination of assets, income, and earning capacity; and
8. Any other factor which in equity should be considered.
Those are the factors set forth in Ferguson v. Ferguson. Those are the factors that this Court has considered in making this determination as to equitable distribution in this case.
Addressing these factors, the Court notes that both parties made substantial contribution to the accumulation of the marital assets. Nancy and James married on September 2, 1992. It was Nancy’s third marriage, James’ sixth marriage. At the time of their marriage, Nancy was purchasing her own home, she worked for the Parmer’s Home Administration and earned approximately $33,000 annually. James was purchasing his home, which he still owned jointly with his former wife, Donna.

In addition to his home, James was purchasing a business, a lube center which was also jointly owned by James and his former wife. Peoples Bank and Trust Company, the mortgage holder, foreclosed on the lube center on November 26, 1992, after James and Nancy married. On November 27, 1992, the foreclosure trustee executed a trustee’s deed to James for $62,000.

After their marriage, Nancy continued to work at the Farmer’s Home Administration until 1994. However, she was very much involved with the operation of the lube center. She did virtually all of the bookkeeping and office work. In 1994, she retired from the Farmer’s Home Administration to work full time for the lube center. At the time of her retirement, she received a $25,000 buyout. After taxes, Nancy received approximately $16,000 and a monthly retirement benefit of $731.
After the November 27, 1992, repurchase, the lube center referred to as Lube Center No. 1 made payments from funds generated by the business. Additionally, through the efforts of both parties, the business grew and the parties acquired additional assets. The Court is impressed by the amount of property the parties acquired through their joint efforts, and I commend them for their diligence in doing so.
With respect to Factor No. 2 under Ferguson though, the withdrawal or disposal of assets, James contends that Nancy wrongfully took thousands of dollars from the lube centers. This allegation, to this Court, was never supported by credible proof. James did wrongfully dispose of three assets in derogation and in violation of the Court’s order as here and after discussed. The Court does not tolerate such violation of court orders.
The market value as reflected by the amounts received at the various sales. That factor is considered here.
With respect to factor four, Nancy brought her retirement into the marriage, James brought an undivided one-half interest in his home.
The Court has considered factors five, six, and seven under Ferguson and based upon this analysis, the Court is of the opinion that an equitable division of the funds being held will be an equal division. In other words, each party would be entitled to $148,256.33 from the funds subject to division.
It is necessary though for this Court to make certain adjustments from the *335 funds which would be received by Mr. Parker. On December 11, 2002, the Court entered an order that, quote, No assets, including but not limited to the home and Parker’s Quick Lube, may be sold or transferred to a third person by either party until the Court has heard from all parties, close quote.
Despite that order, on March 25, 2004, James transferred one of the lube centers to Susie A. Grissom and Ralph David Owen. Earlier, on January 16, 2003, James conveyed 3.01 acres and a home to Jimmy Ray Parker and wife, Barbara Lynn Parker. This is noted in Exhibit 14 in the trial. These conveyances, made after the Court’s order of December 11, 2002, are especially troublesome to this Court, in view of the admission by Mrs. Grissom to a telephone conversation she had with James wherein he had plotted to convey property out of his name to prevent Nancy from receiving anything.
In addition to these two conveyances, on May 3, 2004, James executed a lease, Exhibit 45 in evidence, in favor of Val-U-Sales and Leasing, Inc., on the property described as Lube Center No. 2. As above noted, this property sold for $55,850 at the judicial sale that was ordered by this Court. The appraised value of this property is $100,000. At the time James executed the lease purchase agreement, he received $20,000 and $1,000 per month until the judicial sale. None of these funds were paid to or divided with Nancy. The stipulated appraised value of the lube center transferred to Susie A. Grissom is $145,000. The value of the 3.01 acres transferred to Jimmy Ray Parker and wife, Barbara Lynn Parker, is $36,000. The difference in the appraised value of the Lube Center No. 2 and the amount it brought at the judicial sale is $44,150. These three values total $225,150. One-half of this figure is $112,575, which should be paid to Mrs. Parker for [sic] Mr. Parker’s share of the funds being held by the Chancery Clerk of Itawamba . County, Mississippi. Stated differently, James, in derogation and in violation of this Court’s order, disposed of three significant assets (Lube Center No. 1, deeded to Susie A. Grissom; 3.01 acres deeded to Jimmy Ray and Barbara Lynn Parker; and Lube Center No. 2, leased with an option to purchase to Val-U-Sales and Leasing, Inc.). But for James’ violation of the Court’s order, Nancy would have received one-half of the value of these assets.
Accordingly, the plaintiff, Nancy Carroll [sic] Parker, shall receive $260,831.33 from the funds being held by the Chancery Clerk of Itawamba County, Mississippi, and the clerk is ordered to pay that sum to her. The defendant, James Parker, shall receive the remaining balance of $35,681.33. From the defendant’s proceeds shall be deducted the sum of $10,000 which shall be awarded to the plaintiffs attorney in partial compensation for services rendered for and on behalf of the plaintiff. There shall also be deducted any and all remaining court costs, if any.
As can be seen from the above, the court conducted an extensive analysis of the relevant Ferguson factors. Additionally, the court specifically addressed the assets that James complains of: his one-half interest in the marital home and the work that he had put into establishing the business.
¶ 26. There is ample evidence to support the court’s findings. The evidence was clear that both James and Nancy contributed significantly to the accumulation of the marital estate. Additionally, the chancellor properly found that multiple Ferguson factors favored Nancy rather than James. Therefore, we find that the *336 record supports the chancellor’s decision to split the marital estate equally. The chancellor’s findings were lengthy and detailed regarding the Ferguson factors.
¶ 27. This contention of error is without merit.
¶ 28. THE JUDGMENT OF THE CHANCERY COURT OF ITAWAMBA COUNTY IS AFFIRMED IN PART AND REVERSED AND RENDERED IN PART IN ACCORD WITH THIS OPINION. COSTS OF THIS APPEAL ARE ASSESSED ONE-SIXTH TO AP-PELLEE AND FIVE-SIXTHS TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., CHANDLER, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.

. James raises eight separate issues. However, three of his issues allege that various pieces of property were improperly classified as marital property. For clarity’s sake, we have combined these three separate issues into one single issue.

. Lauro v. Lauro, 847 So.2d 843 (Miss.2003).