930 So.2d 415 (2005)
Charles W. SPENCE, Appellant
v.
Donna G. SPENCE, Appellee.
No. 2004-CA-00096-COA.
Court of Appeals of Mississippi.
August 16, 2005.
Lawrence Primeaux, Meridian, attorney for appellant.
Henry Palmer, attorney for appellee.
Before KING, C.J., MYERS and ISHEE, JJ.
MYERS, J., for the Court.
¶ 1. This case arises from the Chancery Court of Lauderdale County where Donna Spence was granted a divorce from Charles Spence on the grounds of habitual, cruel and inhuman treatment and adultery. Further, the chancellor divided the marital assets between the parties, awarded Donna custody of the two children, and ordered Charles to pay child support and alimony. Aggrieved by the ruling of the *416 chancellor, Charles appeals, raising the following four issues, which we recite verbatim:
I. WHETHER THE CHANCELLOR WAS MANIFESTLY IN ERROR IN AWARDING DONNA A DIVORCE.
II. WHETHER THE CHANCELLOR ERRED IN AWARDING DONNA AN EXCESSIVE AMOUNT OF ALIMONY.
III. WHETHER THE CHANCELLOR WAS MANIFESTLY IN ERROR IN AWARDING DONNA A DISPROPORTIONATE SHARE OF THE MARITAL ESTATE.
IV. WHETHER THE CHANCELLOR WAS MANIFESTLY IN ERROR IN AWARDING DONNA AN ATTORNEY'S FEE IN THIS CASE.
¶ 2. Finding that the chancellor erred in the grant of divorce, we reverse and render the trial court's ruling.

STATEMENT OF FACTS
¶ 3. On December 29, 1981, Charles and Donna were married, and two children, Leah and Josh, were born of the marriage. On April 25, 2002, Donna filed her complaint for divorce, alleging habitual, cruel and inhuman treatment as grounds for divorce and, alternatively, irreconcilable differences. On March 6, 2003, Donna filed an amended complaint for divorce which alleged habitual, cruel and inhuman treatment as well as adultery as the fault based grounds for divorce and, alternatively, irreconcilable differences. It was upon Donna's amended complaint that the divorce was granted.
¶ 4. At trial, Donna testified to several incidents which she contends constituted habitual, cruel and inhuman treatment. Donna argues that the instances about which she testified support a grant of divorce based upon this ground. Further, Donna argues that the circumstances surrounding the relationship between Charles and a neighbor, Gail Gullette, provides sufficient grounds for a finding of adultery.

LEGAL ANALYSIS

I. WHETHER THE CHANCELLOR WAS MANIFESTLY IN ERROR IN AWARDING DONNA A DIVORCE.

STANDARD OF REVIEW
¶ 5. "A chancellor's findings of fact will not be disturbed unless manifestly wrong or clearly erroneous." Sanderson v. Sanderson, 824 So.2d 623, 625(¶ 8) (Miss. 2002) (citing Consolidated Pipe & Supply Co. v. Colter, 735 So.2d 958, 961(¶ 13) (Miss.1999)). "This Court will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his or her discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." Kilpatrick v. Kilpatrick, 732 So.2d 876, 880(¶ 13) (Miss.1999) (quoting Herring Gas Co. v. Whiddon, 616 So.2d 892, 894 (Miss.1993)).

DISCUSSION
¶ 6. Charles first argues that the chancellor erred in awarding Donna a divorce on the grounds of habitual, cruel and inhuman treatment and adultery. Charles argues each of these two grounds separately and we will address each ground in like fashion.

Adultery
¶ 7. In order to prevail on a claim of adultery, a party must prove his or her claim by clear and convincing evidence. Dillon v. Dillon, 498 So.2d 328, 330 (Miss. 1986). This showing by clear and convincing evidence must demonstrate both an adulterous inclination and a reasonable opportunity to satisfy that inclination. Id. Although circumstantial evidence may aid *417 in proving such a claim, the proponent retains the burden of presenting satisfactory evidence which is sufficient to lead the trier of fact to a conclusion of guilty. Id. (citing Rodgers v. Rodgers, 274 So.2d 671, 673 (Miss.1973)).
¶ 8. Charles argues that though there was evidence of affection between he and Gail, there was no evidence of a sexual relationship, and any proof of an adulterous relationship was circumstantial at best. Donna argues that due to this Court's highly deferential standard of review in examining the decision of a chancellor, that based upon the evidence presented, the decision must be affirmed.
¶ 9. In making the decision to grant a divorce on the ground of adultery, the chancellor was required to make a finding of fact. Dillon, 498 So.2d at 330. "Where chancellors make such findings of fact, this Court has consistently held that their decisions will not be set aside on appeal unless they are manifestly wrong." Id.
¶ 10. The chancellor's opinion, when addressing the ground of adultery, focused on the testimony given regarding the relationship between Charles and Gail. The chancellor noted that the proof of an adulterous relationship was circumstantial in nature. In determining that such a relationship existed, the chancellor concentrated on Charles's testimony in which he admitted to having affection for Gail, admitted having hugged Gail, admitted having kissed Gail, and admitted that he loved her as a friend. The chancellor takes this a step further, reasoning that because the two parties communicate regularly and share a close friendship, that even though there is no direct evidence of a sexual relationship, only innuendo, "it is not a stretch to believe that this has developed over the time that they have spent together."
¶ 11. There are several instances of testimony which at first blush would lead one to believe that such a relationship was indeed present, but when viewing the testimony as a whole, it becomes readily apparent that such a determination was manifest error. The testimony pertaining to the relationship between the two was given by Charles, Gail, Leah, who is the daughter of the parties, and Donna's cousin, Stacey Bozeman. As stated previously, Charles testified that he has hugged Gail, that he has kissed Gail, and that he loves her as a friend. When explaining his feeling towards Gail, he stated:
I feel close to her in the way that we have become friends. We found common ground together in the divorce matter. She's been through a divorce. She seems to relate and understand what I'm going through. And she's become a good friend and we do a lot of things together.
Though Charles testified about his affections for Gail, he denied any type of romantic involvement or sexual relationship, and denied any plans of marriage. Gail testified in a similar manner. When asked about Charles's feelings towards her, she stated that he "[l]ove[s] me as a person. Maybe the person I am, you know. But as far as being in love with someone, you know(witness shakes head in negative response)." Both parties testimony stated that the two were not romantically involved, only that they had developed a strong friendship, as they both shared the experience of going through divorce.
¶ 12. Leah further corroborated the testimony of Charles and Gail. Her testimony on the relationship between the two is as follows:
Q. Do you know a woman named Gail Gullette?
A. Yes.
Q. And how do you know her?

*418 A. From the apartments.
Q. From your dad's apartment?
A. Uh-Hun. Yes.
Q. Have you seen them together when you have visited over there?
A. Yes.
Q. Have you ever witnessed your dad and Gail Gullette in your presence do anything that you would consider to be improper for a married man and a woman with him who is not married to him?
A. No.
Q. Have you ever seenhave you ever been with them under circumstances that made you uncomfortable about what their relationship might be?
A. No.
Q. Have you ever seen them together under any kind of questionable circumstances that would raise questions in your mind that they were doing something improper?
A. No.
Q. As far as what you have been able to observe, how would you describe their relationship?
A. As friends. She has been through a divorce and I feel that she is just helping my dad get through this one. I have been over there and never saw anything thatmy dad is very well liked at the apartments. I don't know anybody that doesn't like him. When he first moved in, he had people inviting him over to eat and some would be girls and some wouldn't. You know, I don't feel that he has any relationship with Gail that is as girlfriend or anything like that.
As Leah's testimony demonstrates, the relationship between Gail and Charles did not appear to be anything other than a close friendship.
¶ 13. The chancellor put a great amount of weight in the testimony of Charles and opined that due to the nature of their close relationship, that it was logical to conclude that the two had committed adultery. In buttressing this opinion, the chancellor relied on the testimony of Donna's cousin, Stacey. Stacey testified that she resided at the same apartment complex as Charles and Gail. She stated that she had seen Charles's and Gail's vehicles parked together in front of one or the other's apartment on two or three occasions and that the two vehicles had remained in place throughout the night. Further, Stacey testified that she had overheard Charles discussing his and Gail's plans to take off work to spend the day together. Finally, Stacey testified that she had witnessed Gail leave Charles's apartment clad in a robe and pants.
¶ 14. On cross-examination, Stacey admitted that when she witnessed Gail leaving Charles's apartment in a robe, it was approximately 8:00 or 9:00 o'clock on a Saturday morning in December and that she was unaware what other clothing she was wearing underneath the robe. Further, Stacey testified that she did not see Gail go into the apartment. When asked about his plans to take the day off from work to spend time with Gail, Stacey admitted that she was uncertain who Charles intended to spend the day with. Further testimony in the record negates Stacey's assertion that Charles's and Gail's vehicles were parked next to one another throughout the night. Gail testified that her neighbor's daughter owns the exact make, model, and color vehicle as Charles, and that she from time to time would park in front of Gail's apartment.
¶ 15. As stated previously, in order to obtain a grant of divorce based upon adultery, one must prove by clear and convincing evidence an adulterous inclination and a reasonable opportunity fulfill that inclination. Dillon, 498 So.2d at 330. In the case sub judice, such a showing has not *419 occurred. The testimony of Stacey indicated that the Charles's and Gail's vehicles were parked next to one another on several occasions throughout the night. This testimony was a broad allegation which was unfounded, as further testimony indicated that Gail's neighbor's daughter drove the exact type of vehicle. Stacey did not testify to the license plate number or give any testimony of descriptive characteristics unique to Charles's vehicle. As the remainder of Stacey's testimony was completely negated on cross-examination, to hold that her testimony clearly and convincingly proved adulterous activity was error.
¶ 16. Further, the court focused on the lunches shared by Charles and Gail in which they meet at the park, feed the ducks, and eat peanut butter and jelly sandwiches while discussing life's problems. Though admittedly if taken at face value, such meetings could indicate a relationship of a different character, these lunches are also characteristic of the type of activity which can occur when a person is experiencing a troubling time and would need a friend's advice. When taking the testimony as a whole, Charles's alleged infidelity has not been proven by clear and convincing evidence. The testimony of Charles, Gail, and Leah stated that the two were close friends and that Gail was helping Charles through this period of his life by sharing her experiences of divorce. As the Mississippi Supreme Court has previously held, when one alleges adulterous activity, "the burden of proof is a heavy one . . . because the evidence must be logical, tend to prove the facts charged, and be inconsistent with a reasonable theory of innocence." Owen v. Gerity, 422 So.2d 284, 287 (Miss.1982) (citing Banks v. Banks, 118 Miss. 783, 787-88, 79 So. 841, 842 (1918)) (emphasis added). The facts upon which the chancellor relied are not clear and convincing in nature and are not inconsistent with a reasonable theory of innocence. As the Mississippi Supreme Court has previously stated: "`Trifles light as air' may be sufficient to convince the jealous or the suspicious, but they do not impress the court with the same degree of credulity. Before accepting charges so seriously affecting the character of a person, the evidence must be clear and convincing." Banks, 118 Miss. at 788, 79 So. at 842. As such, the evidence presented does not rise above mere suspicion of adultery. Therefore, the award of divorce to Donna on the ground of adultery is reversed.

Habitual, Cruel and Inhuman Treatment
¶ 17. Charles next contends that the chancellor erred by granting Donna a divorce based upon the ground of habitual, cruel and inhuman treatment. In support of his position, Charles argues that the evidence concerning this ground for divorce consisted of the uncorroborated testimony of Donna and that the events about which she testified were isolated incidents, failing to establish sufficient grounds for divorce.
¶ 18. In granting Donna a divorce on the ground of habitual, cruel and inhuman treatment, the chancellor again relies on the entire line of testimony favorable to Donna in regards to the alleged incidents of which she testified, while neglecting the unfavorable testimony given by Leah and Josh, which negated Donna's assertions. Donna testified that Charles belittled her, called her names, and manipulated the finances to the family's detriment. Portions of this testimony were corroborated by the children, as both Leah and Josh testified that their parents would often quarrel and that Charles had manipulated the finances on occasion, by decreasing the amount *420 available to the household for the week's groceries.
¶ 19. Although it was undisputed that the parties argued frequently, Leah testified that her parents would argue but that there was never any physical violence between the two, stating:
Q. In fact, neither your dad nor your mom hit each other during these arguments, did they?
A. No, sir.
Q. Neither your dad nor your mom ever that you saw ever inflicted any kind of physical punishment on each other, did they?
A. No, sir.
¶ 20. The testimony established there were repeated arguments, though no evidence or testimony was presented which would corroborate Donna's assertion and support a finding of habitual, cruel and inhuman treatment. Leah testified that both parties would participate in these arguments. Other than quarrels between Donna and Charles, there was no evidence presented of any other occurrences which would make Charles's actions
a course of conduct on the part of the offending spouse which was so unkind, unfeeling or brutal as to endanger or put one in reasonable apprehension of danger to life, limb or health, and further, that such course of conduct must be habitual, that is, done so often, or continued so long that it may reasonably be said a permanent condition.
Wilson v. Wilson, 547 So.2d 803, 805 (Miss.1989).
¶ 21. The burden of proof for habitual, cruel and inhuman treatment is of a less stringent standard than that of proving adultery. Habitual, cruel and inhuman treatment is to be proven by a preponderance of the credible evidence, Smith v. Smith, 614 So.2d 394, 396 (Miss.1993); yet, we find that granting a divorce in this instance was improper. The only evidence of bad circumstances in the marital home, which was corroborated, was that the spouses had arguments. The Mississippi Supreme Court has previously held, and it is well-established in our caselaw, that denial of a divorce based upon this ground may "[result] in rendering her unhappy and her marital bond irksome, but for that alone the law of this state does not sanction a divorce." Russell v. Russell, 157 Miss. 425, 430, 128 So. 270, 272 (1930).
¶ 22. Although the chancellor erred in granting the divorce on these grounds, it is clear from the record why the chancellor acted in the manner in which she did. Both parties wanted the divorce, but neither would agree to an irreconcilable differences divorce. In fact, the chancellor cautioned the parties's attorneys prior to a lunch break as follows:
THE COURT: Now your client wants a divorce, doesn't he? I mean, you know, we are treading on risky ground here. I mean, if there is not sufficient evidence to support her complaint for divorce as pointed out in your argument and the Court reviews all of this information and finds that there is not sufficient grounds for divorce, there might be a problem if your client wants a divorce, too, so, if you are at all hesitant, Mr. Palmer, about the weight of your proof and whether or not it comes up to the level required for the Court to grant a divorce, y'all might want to talk about a consent of some kind.
MR. PRIMEAUX: If you see any blue tint to my face, Judge, I mean, I am telling you that I have discussed that literally until I was blue in the face. THE COURT: Okay. Well, I am just you know, consider yourselves warned. You know, Mississippi is tough on that. So, you know, I have not reviewed all the notes and I am not making any adjudication at this time. But, I mean, *421 we have been at this for six days and if these parties want to be sure at the end of the day that we are going to have a divorce, they might want to consider that. So you might want to mention that so they can chew it up during lunch. I will see you back at 1:15.
Though in fact the parties wished to obtain a divorce, the grant of divorce on these grounds was improper. Therefore, we reverse the findings of the chancery court, granting Donna a divorce on the grounds of adultery and habitual, cruel and inhuman treatment. As our reversal on the first issue nullifies the remaining issues raised on appeal, we decline to address these issues.
¶ 23. THE JUDGMENT OF THE CHANCERY COURT OF LAUDERDALE COUNTY IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
KING, C.J., BRIDGES AND LEE, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR.