981 So.2d 340 (2008)
Orville McDavid LISTER, Appellant
v.
Judy Lynette LISTER, Appellee.
No. 2005-CA-00494-COA.
Court of Appeals of Mississippi.
May 6, 2008.
Gary L. Roberts, Gautier, attorney for appellant.
Michael V. Ratliff, Earl L. Denham, Ocean Springs, attorneys for appellee.
Before KING, C.J., IRVING and CHANDLER, JJ.
*341 CHANDLER, J., for the Court.
¶ 1. On February 11, 2005, the Chancery Court of Jackson County entered a final judgment granting a divorce to Judy Lynette Lister on the ground of uncondoned adultery by her husband, Orville McDavid Lister. The judgment also provided for the equitable distribution of the marital assets between the parties. Aggrieved by the chancellor's judgment of divorce, Orville appeals. He raises a single issue: whether the chancellor erred in granting Judy a divorce based on the ground of adultery.
¶ 2. Finding no error, we affirm.

FACTS
¶ 3. Judy and Orville, both Mississippi residents, married on November 18, 1982. They remained together for almost eighteen years until they separated on February 1, 2000. They had no children as a result of their marriage, but each of them had children from prior marriages. All of those children were emancipated at the time of trial, so there was no issue of custody.
¶ 4. The couple moved to Petal, Mississippi, and in 1986, Orville established and incorporated Bowie River Forest Products, Inc. He was the sole shareholder of the corporation. When the timber industry began to decline, Orville set up Bowie River Construction Company and went into the construction business. Orville incorporated Bowie River Construction in 1994 as a wholly owned subsidiary of Bowie River Forest Products (Bowie River). Judy worked for the company as a secretary, bookkeeper, and office manager.
¶ 5. Judy filed for divorce on March 10, 2000, in the Chancery Court of Jackson County, citing Orville's adultery with his new secretary, Sheila Walters, as her ground for divorce. Thereafter, the chancellor held a hearing on temporary support and entered a temporary order. The order granted Judy temporary use and possession of one of the couple's homes in Ocean Springs, Mississippi, and the chancellor ordered Orville to reinstate Judy's net pay of $700 per week. The order also required Orville to pay the mortgages on the couple's homes, and Orville had to pay Judy an additional $500 per month, which represented one-half of the income from a rental contract to which Judy was a party.
¶ 6. The trial was held from June 4, 2002, until June 6, 2002, and then from February 10, 2003, through February 12, 2003. Regarding the adultery, each of the parties testified, along with Sheila and her husband. A large portion of the trial consisted of testimony concerning the finances of Orville and Bowie River.
¶ 7. In January 1999, Orville hired Sheila as a receptionist for Bowie River. At the time, Sheila was married to Joseph Walters, and they had two children. Judy became suspicious that Orville and Sheila were having an affair. Judy said that Orville and Sheila spent an excessive amount of time together and that they would often be absent from the office at the same time. In the course of her bookkeeping, Judy also discovered that Orville had given Sheila $2,500. Judy ordered Sheila to return the money, and when she did so, Judy terminated her.
¶ 8. Orville was out of town at the time Judy fired Sheila. When he returned and found out what Judy had done, he reinstated Sheila to her position, and he terminated Judy. Orville also moved Sheila into Judy's office and gave her Judy's cell phone.
¶ 9. The marital home was located on the same land as the Bowie River offices. Also located on that land were two mobile homes. While Judy and Orville were together, Judy's daughter lived in one of *342 those mobile homes, and Judy's mother lived in the other. Judy claimed that after she moved to Ocean Springs, Orville forced her daughter and her mother to move out of the Bowie River mobile homes. Orville denied that he forced them to move. Nevertheless, shortly after Judy's daughter moved out, Sheila and her two children moved into the mobile home nearest to the marital home. Another Bowie River employee moved into the second mobile home.
¶ 10. After Judy left, Orville also employed Sheila's mother as a housekeeper to cook for him and to clean his home. Sheila admitted that she and her children had eaten at Orville's house when her mother cooked.
¶ 11. Judy additionally put into evidence a recorded conversation she had with Orville. In that conversation, Orville told Judy, "All I want is a damn divorce. . . . I do not love you anymore, and I want a damn divorce."
¶ 12. Judy responded, "You're the one who started all of it. You are the one who crossed that line, Orville. You broke our marriage vows."
¶ 13. In response, Orville said, "Hey, I'm going to do more than that. You are going to have a broke ass before I am through. . . . You ain't going to have nothing. You ain't going to have a pot to piss in or a window to throw it out of, and I ain't either." When questioned at trial whether he also said that Judy and her mother needed to move out so he could move in another woman, Orville said he made the comment in the heat of an argument. He claimed he was just trying to "shut them up or something."
¶ 14. Sheila's husband, Joseph,[1] initially tried to get a job with Bowie River before Sheila, but the corporation did not hire him. He testified that Orville and Sheila spent an excessive amount of time together, more than most married people. He also pointed out that Orville let her drive company vehicles, and Orville gave her a gas card. He said Sheila would constantly go over to Orville's house to eat with him or to clean his house, and she would often call someone late at night. According to Joseph, shortly after Sheila began working at Bowie River, she told him she wanted to quit the job because Orville was sexually harassing her. Instead, Joseph said Orville gave Sheila $500 and a raise to keep her from quitting.
¶ 15. After Joseph and Sheila separated, Joseph said Sheila went and stayed at Orville's house for five days in a row. He said he spent five days watching Sheila come and go from Orville's house. When cross-examined about the incident, he said he did not remember the exact date, but he said it was two or three weeks after she had left him. He claimed the private investigator who was with him would know the exact dates.
¶ 16. Joseph's mother, Myrtis Walters, also testified that the $500 that Sheila received was to keep Sheila from quitting her job because of Orville's sexual harassment. Furthermore, Myrtis said she observed Sheila riding on motorcycles with Orville, and she saw them shopping for groceries together.
¶ 17. Both Orville and Sheila denied having any type of sexual relationship. They also denied that Sheila had ever spent the night in the Listers' marital home. They admitted taking trips together, including motorcycle rallies in Daytona, Florida and a shopping trip to New York *343 City. However, they maintained that other Bowie River employees would accompany them on those trips. Orville and Sheila also admitted that Orville allowed Sheila to use a company gas card and to drive various vehicles, including a Harley Davidson model Ford F-150 and a Ford Crown Victoria. Once again, however, Orville said that other Bowie River employees enjoyed similar privileges, and the vehicles were owned by the company.
¶ 18. Despite his recorded statements, Orville claimed that he did not want a divorce. He said he wanted to remain married to Judy, and he said she was welcome to come home and work for Bowie River again. Nevertheless, he said he was not willing to remove Sheila from her position at Bowie River, nor was he willing to stop riding motorcycles with her.
¶ 19. Both parties rested, but before the chancellor entered a judgment, Judy filed a motion to reopen the record. In the motion, she alleged that Orville had concealed financial information during the trial. The chancellor heard testimony and argument concerning the motion, after which she granted the motion to reopen the record. The chancellor appointed Koerber Turner PLLC to perform a forensic accounting of Bowie River and to locate its assets. Jim Koerber, of Koerber Turner, later testified at a hearing with regard to his findings. Through his investigation, he discovered bank accounts and assets that Orville had not disclosed.[2] He also discovered that Orville had lost large amounts of unreported money at the casinos.
¶ 20. After the chancellor heard the additional testimony, she entered her findings of fact and conclusions of law. The chancellor then entered a final judgment of divorce, granting Judy a divorce on the ground of uncondoned adultery. The judgment also provided for the equitable distribution of the marital assets.

STANDARD OF REVIEW
¶ 21. We grant the chancellor much discretion in our review of a domestic relations case. Steiner v. Steiner, 788 So.2d 771, 777(¶ 18) (Miss.2001). Our scope of review in such a case is limited by the substantial evidence/manifest error rule. Mizell v. Mizell, 708 So.2d 55, 59(¶ 12) (Miss.1998). We will not disturb a chancellor's findings unless manifestly wrong, clearly erroneous, or an erroneous legal standard was applied. Id. at 59(¶ 13).

LAW AND ANALYSIS
¶ 22. The sole issue Orville raises on appeal is whether the chancellor erred in granting Judy a divorce on the ground of adultery. He argues that Judy did not prove adultery by clear and convincing evidence; therefore, the chancellor erred in granting the divorce. Orville argues that the judgment granting divorce should be reversed, and the corresponding equitable division of assets should, therefore, be set aside. Besides Orville's claim that the division of assets should be set aside because the divorce was improper, he does not take issue with the chancellor's property division.
¶ 23. A party seeking a divorce on the ground of adultery must prove the adultery by clear and convincing evidence. McAdory v. McAdory, 608 So.2d 695, 699 (Miss.1992) (quoting Dillon v. Dillon, 498 So.2d 328, 329 (Miss.1986)). The party seeking the divorce may establish adultery *344 by showing "an adulterous inclination coupled with an opportunity to consummate the inclination." Reynolds v. Reynolds, 755 So.2d 467, 469(¶ 7) (Miss.Ct.App.1999) (citing Holden v. Frasher-Holden, 680 So.2d 795, 798 (Miss.1996)). "The inclination may be proven by showing either an infatuation with a particular person or a general adulterous propensity." Id. The chancellor must set forth specific findings of fact and conclusions of law with regard to an allegation of adultery. Id.
¶ 24. Direct evidence is not necessary to prove adultery. The supreme court has stated the following in regard to such allegations of adultery:
Where the accusing spouse relies on circumstantial evidence to support allegations of infidelity, the accuser carries a heavy burden of convincing the trier of fact of the accused adulterer's guilt through logical evidence tending to prove the allegation that is inconsistent with a reasonable theory of innocence; however, the proof need not be beyond a reasonable doubt, and direct evidence is not required given the inherently secretive nature of adulterous relationships.
Id. (citing Owen v. Gerity, 422 So.2d 284, 287 (Miss.1982)).
¶ 25. Nevertheless, the Court may reverse a divorce decree based on adultery when the evidence is lacking. See McAdory, 608 So.2d at 701; see also Spence v. Spence, 930 So.2d 415, 418-19 (¶¶ 15-16) (Miss.Ct.App.2005). In reversing a chancellor's judgment granting divorce, the supreme court reiterated that "`[t]rifles light as air' may be sufficient to convince the jealous or the suspicious, but they do not impress the court with the same degree of credulity. Before accepting charges so seriously affecting the character of a person, the evidence must be clear and convincing." McAdory, 608 So.2d at 701 (quoting Banks v. Banks, 118 Miss. 783, 788, 79 So. 841, 842 (1918)).
¶ 26. Orville argues that under this Court's decision in Spence, the evidence presented by Judy was not clear and convincing in nature. He, therefore, argues that it was manifest error for the chancellor to grant a divorce based on adultery.
¶ 27. The evidence presented here is distinguishable from that in Spence. In Spence, this Court found that most of the evidence suggested that the husband and his alleged mistress were just close friends. Spence, 930 So.2d at 419(¶ 16). Furthermore, we found the testimony that the husband spent the night at the alleged mistress's apartment to be unfounded because the witness said she saw the husband's car parked next to the alleged mistress's car, but her neighbor's daughter drove the exact same type of vehicle as the husband. Id. at (¶ 15).
¶ 28. In the present case, the chancellor found that the testimony of several witnesses established by clear and convincing evidence the existence of an adulterous relationship between Orville and Sheila. There was no evidence tending to show that Orville had an adulterous nature, but there was evidence of an infatuation with Sheila. Supporting the chancellor's finding was the testimony of Sheila's husband, Joseph, who said he had no doubt that Sheila had committed adultery. Joseph said Sheila began staying at Orville's house shortly after she left him. Joseph claimed he saw Sheila staying at Orville's house five days in a row.
¶ 29. There is no requirement that the adultery precede the spouses' separation. Curtis v. Curtis, 796 So.2d 1044, 1051(¶ 31) (Miss.Ct.App.2001) (quoting Talbert v. Talbert, 759 So.2d 1105, 1110-111(¶ 16) (Miss.1999)). Accordingly, it was proper for the chancellor to consider Joseph's testimony concerning Orville and *345 Sheila's actions after Judy left the marital home.
¶ 30. Judy testified that Orville and Sheila spent a lot of time together and would often be absent from the office at the same time. Judy also took issue with the fact that Orville gave Sheila money, which was something Sheila never told her husband.
¶ 31. Both Orville and Sheila denied any adulterous relationship. Orville told Judy that he did not love her anymore and that he wanted a divorce. He allowed Sheila to move into the mobile home next to his own house shortly after Judy left him, and he even loaned her money to pay for her divorce from Joseph. Orville said the vehicles that Sheila drove were company vehicles, but his personal assets were so intertwined with those of Bowie River that they might as well have been personal vehicles. Sheila admitted that she rode on the motorcycle with Orville, and they took long trips together.
¶ 32. As the fact-finder, it was the chancellor's duty to judge the credibility of the witnesses. Owen v. Owen, 928 So.2d 156, 168(¶ 35) (Miss.2006) (quoting Simmons v. Jaggers, 914 So.2d 693, 697(¶ 20) (Miss.2005)). In considering Orville's denial of any sexual relationship, the chancellor certainly could have considered the fact that Orville failed to disclose a significant amount of assets when he turned over Bowie River's financial records.
¶ 33. Taking into account the discretion we grant to the chancellor's findings, when reviewing the testimony presented in this case, we find no error in the chancellor's decision to enter a divorce on the ground of adultery. Despite his denial of any sexual relationship with Sheila, the facts were sufficient to establish that Orville had an infatuation with her sufficient to be an adulterous inclination. There was also sufficient testimony that Orville and Sheila had opportunities to consummate that inclination. We find this issue is without merit; therefore, we affirm the chancellor's judgment of divorce.
¶ 34. THE JUDGMENT OF THE CHANCERY COURT OF JACKSON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
NOTES
[1] Joseph had filed for divorce from Sheila, but they were still married at the time of Judy and Orville's trial.
[2] Koerber testified that one of the undisclosed accounts had a balance of more than $1.5 million at one point in time.