MAXWELL, J.,
 

 for the Court:
 

 ¶ 1. Jeff and Bonnie Lynn (“Lynn”) Dickerson were divorced in the Warren County Chancery Court. The divorce was granted on the ground of Jeffs uncon-doned adultery. The chancellor classified, valued, and divided the parties’ property. The chancellor also awarded attorneys’ fees to Lynn. On appeal, Jeff raises the following issues:
 

 I. Whether Lynn’s “unfaithfulness” constituted a ground for divorce;
 

 II. Whether the chancellor erred in her distribution of marital property and debt;
 

 III. Whether the chancellor erred in awarding lump-sum alimony to Lynn; and
 

 IV. Whether the chancellor erred in awarding attorneys’ fees to Lynn.
 

 Finding no reversible error, we affirm.
 

 FACTS
 

 ¶ 2. Jeff and Lynn were married for the first time in 1999. After about two-and-a-half years together, they divorced. Though the couple parted ways for a short time, in June 2003, they remarried. However, they separated again in April 2006, and Lynn filed for divorce the next month.
 

 ¶ 3. Years before meeting Lynn, Jeff started Dickerson Tire Company (“Dickerson Tire”). He operated the company as a sole proprietorship throughout the parties’ marriage. Lynn testified her main priority was helping Jeff operate Dickerson Tire, which she did for no salary. She also held a real-estate license and performed real-estate work part time.
 

 ¶ 4. Debbie Snyder regularly visited Dickerson Tire. She had previously been married to one of the tire store’s employees. At some point after her divorce, Snyder became romantically involved with Jeff. At trial, Snyder admitted she had been sleeping with Jeff for more than a year, but she denied doing so before Jeff and Lynn separated. Jeff also denied the affair occurred prior to his separation from Lynn.
 

 ¶ 5. However, Susan Brasfield, who had been married to another Dickerson Tire employee, testified that in early 2005 Jeff and Snyder had dinner together one night while Lynn was out of town. Brasfield testified that the next day Jeff and Snyder admitted to other Dickerson Tire employees they were romantically involved. Brasfield also testified that Jeff and Snyder were openly intimate with each other in the shop and that Snyder would often sit on Jeffs lap and “kiss on him.” Bras-field claimed Jeff also gave Snyder money on numerous occasions.
 

 ¶ 6. Snyder testified about an incident involving Lynn that occurred in 2004. According to Snyder, she and Lynn went to a “topless bar.” The two met a man, who accompanied them to Lynn’s and Jeffs residence. Snyder explained that she, Lynn, and the unidentified man then went “skinny dipping” in a nearby lake. However, Snyder admitted that she did not “see anything sexual happen” between them.
 

 ¶ 7. Following Lynn’s separation from Jeff, Lynn lived with her mother. She met her mother’s next door neighbor, Larry Wade, and eventually became romantically involved with him. Wade testified that he had been having a sexual relationship with Lynn since February 2007 and had provided for her financially since that time.
 

 PROCEDURAL HISTORY
 

 ¶ 8. Lynn filed for her second divorce from Jeff on May 22, 2006. She alleged
 
 *641
 
 habitual cruel and inhuman treatment or, in the alternative, irreconcilable differences. Jeff filed an answer and counterclaim alleging habitual cruel and inhuman treatment as well as adultery. In the alternative, Jeff requested an irreconcilable differences divorce. Lynn later amended her divorce complaint to include uncondoned adultery as a ground for divorce. Jeff and Lynn have no minor children, so there were no custody or child support issues.
 

 ¶ 9. On May 23, 2008, the chancellor entered a written final judgment granting Lynn a divorce based upon Jeffs uncon-doned adultery. The judgment included a distribution of the marital property that favored Lynn.
 

 ¶ 10. The parties stipulated that multiple items of personal property should be classified as marital. Of these items, they agreed Lynn should receive $12,020 worth of personal property, and $27,002.83 worth of personal property would be distributed to Jeff.
 

 ¶ 11. Responsibility for the parties’ credit card debt was in dispute. The chancellor found that $14,167.10 in credit card debt was marital debt, which the chancellor ordered Jeff to pay.
 

 ¶ 12. The parties also disputed the proper designation and/or distribution of the following four significant pieces of property: Dickerson Tire, which had equity in the amount of $215,065.42; two pieces of real property with a total equity of $44,849.49; and a 2001 Lexus vehicle with equity of $2,668.98. The chancellor found Dickerson Tire was Jeffs separate property. However, the chancellor determined the two real-estate properties and the Lexus were marital property. Lynn was awarded ownership of the Lexus and $28,269.37 of the net sale proceeds from the two properties. The chancellor ordered the remaining balance of the net sale proceeds to be applied to Lynn’s award of attorneys’ fees. Jeff was also ordered to pay Lynn’s attorneys’ fees that the net sale proceeds of the real properties were insufficient to cover. Finally, the chancellor ordered Jeff to pay Lynn $10,096.02 in lump-sum alimony, which represented the amount owed on the 2001 Lexus vehicle.
 

 STANDARD OF REVIEW
 

 ¶ 13. This Court will not disturb a chancellor’s findings unless the chancellor’s decision was manifestly wrong or clearly erroneous, or the chancellor applied an improper legal standard.
 
 Wallace v. Wallace,
 
 12 So.3d 572, 575 (¶ 12) (Miss.Ct.App.2009). We review questions of law de novo.
 
 George v. George,
 
 22 So.3d 424, 427 (¶ 4) (Miss.Ct.App.2009).
 

 DISCUSSION
 

 I. Lynn’s Alleged Adultery
 

 ¶ 14. Jeff argues the chancellor should have granted him a divorce on the ground of adultery based on (1) Lynn’s alleged adultery with the unidentified man from the “skinny-dipping” incident, and (2) Lynn’s relationship with Wade after her separation from Jeff.
 

 ¶ 15. Mississippi Code Annotated section 93-5-1 (Supp.2009) provides that adultery is a ground for divorce, unless the parties colluded in procuring the divorce or cohabited after the plaintiffs knowledge of the adultery. “Where adultery is alleged, the chancellor is required to set forth specific findings of fact and conclusions of law in this regard.”
 
 Reynolds v. Reynolds,
 
 755 So.2d 467, 469 (¶ 7) (Miss.Ct.App.1999) (citation omitted). Where a chancellor does make such findings, his or her decision will not be set aside on appeal unless the chancellor manifestly erred.
 
 *642
 

 McAdory v. McAdory,
 
 608 So.2d 695, 699 (Miss.1992).
 
 [1]
 

 ¶ 16. Our supreme court has explained: “adultery cannot be committed by an unmarried woman with an unmarried man, the gist of the offense being voluntary sexual intercourse of a married person with a person other than the offender’s spouse.”
 
 Owen v. Gerity,
 
 422 So.2d 284, 287 (Miss.1982). Adultery may be proven by either direct evidence or, because of the often “secretive nature” of the conduct, circumstantial evidence.
 
 Dillon v. Dillon,
 
 498 So.2d 328, 330 (Miss.1986). The plaintiff must prove by clear and convincing evidence: (1) an adulterous inclination and (2) a reasonable opportunity to satisfy that inclination.
 
 Atkinson v. Atkinson,
 
 11 So.3d 172, 177 (¶ 20) (Miss.Ct.App.2009) (citation omitted). Establishing an “adulterous inclination” requires proof of either the defendant’s infatuation with a particular person or general adulterous propensity.
 
 Lister v. Lister,
 
 981 So.2d 340, 344 (¶ 23) (Miss.Ct.App.2008).
 

 ¶ 17. Here, the chancellor made the following findings of fact:
 

 During the trial, [Snyder] testified that in August 2004, she and [Lynn] went to a bar in Louisiana where [Lynn] convinced a man to go home with them. [Snyder] further testified that while [Jeff] was asleep in his bedroom, [Lynn] went swimming with the man and took her shirt off in front of him. [Snyder] also stated that she believed the two ( [Lynn] and the unidentified man) had sex that night. This testimony was contradicted by [Lynn] who testified that she in fact went to bed with [Jeff] that night and that it was [Snyder] who slept with the unidentified man. This was the only testimony presented regarding [Lynn’s] alleged adulterous behavior pri- or to the parties’ separation.
 

 [Brasfield] ... offered testimony regarding [Jeffs] and [Snyder’s] adulterous relationship. [Brasfield] stated that while [Lynn] was out of town in early 2005, [Jeff] and [Synder] had dinner together one night[,] and that the next day both admitted to her, and other employees of Dickerson Tire, that the two were in fact having a sexual relationship. [Brasfield] stated that after [Jeffs] and [Snyder’s] admission, they were openly intimate with one another at [Dickerson Tire]. She stated that on one occasion she witnessed [Snyder] sitting in [Jeffs] lap. [Lynn] testified that [Jeff] confessed to having an illicit relationship with [Snyder] during the marriage. [Jeff] denied that he ever had sexual relations with [Snyder] prior to their separation.
 

 ¶ 18. Thus, there was abundant evidence of Jeffs adultery, including Jeffs and Snyder’s multiple admissions. Accordingly, the chancellor was well within her discretion in granting a divorce to Lynn. This is true even though Jeff asserts that Lynn also had adulterous affairs of her own.
 

 ¶ 19. Although Jeff never uses the term “recrimination,” he raises, in essence, a recrimination argument. The defense of recrimination “is founded on the basis that the equal guilt of a complainant bars his/her right to divorce, and the principal consideration is that the complainant must come into court with clean hands.”
 
 Harmon v. Harmon,
 
 757 So.2d 305, 309
 
 *643
 
 (¶ 10) (Miss.Ct.App.1999). But our precedent makes clear that one party’s adultery, even if established at trial, does not prevent the chancellor from granting a divorce to that party.
 
 Id.
 
 at (¶ 12).
 
 See also
 
 Miss.Code Ann. § 93-5-3 (Rev. 2004) (“If a complainant or cross-complainant in a divorce action shall prove grounds entitling him to a divorce, it shall not be mandatory on any chancellor to deny such party a divorce, even though the evidence might establish recrimination on the part of such complainant or cross-complainant.”). For instance, in
 
 Parker v. Parker,
 
 519 So.2d 1232, 1236 (Miss.1988), our supreme court reversed a chancellor’s decision denying a woman, who had committed post-separation adultery, a divorce based on recrimination. The court reasoned:
 

 While this Court is not suggesting con-donation of the conduct of the appellant wife after the separation of the parties, when we balance out the uncontradicted evidence that the conduct of the appellee was responsible for the separation of the parties and the dissolution of their marriage; that the misconduct of the appellant wife occurred after the destruction of the marriage; and that the [Legislature has, in the least, greatly weakened the defense of recrimination; we are of the opinion that the learned chancellor erred in denying a divorce to [the] ap-pellantf.]
 

 Id.
 
 Here, Jeff primarily relies on Snyder’s testimony to support his contention that Lynn committed adultery prior to the parties’ separation. However, Snyder admittedly did not observe anything of a sexual nature occur during the sole encounter between Lynn and the unidentified man. Jeffs argument rests on Snyder’s testimony about the “skinny-dipping” incident, but the conduct described by Snyder falls short of the definition of adultery.
 
 Owen,
 
 422 So.2d at 287. Furthermore, although Lynn and Wade both admitted having a sexual relationship since February 2007, their relationship began months after the parties’ separation and did not cause the separation. On the other hand, the evidence showed Jeff committed adultery pri- or to the parties’ separation and continued his relationship with Snyder up until and well after his separation from Lynn.
 

 ¶ 20. For these reasons, we are unable to say that the chancellor committed manifest error in granting a divorce to Lynn based upon Jeffs uncondoned adultery.
 

 II. Distribution of Property
 

 ¶ 21. Jeff contends the chancellor’s distribution of marital property is not supported by substantial evidence. Jeff acknowledges the chancellor addressed the factors set forth in
 
 Ferguson v. Ferguson,
 
 639 So.2d 921, 928 (Miss.1994). However, he argues the chancellor failed to give adequate weight to his efforts in accumulating assets and Lynn’s alleged lack of contributions.
 

 ¶ 22. Jeff argues that essentially all of the income brought into the marriage was from Dickerson Tire. He also claims that Lynn, who is a licensed realtor, engaged in only minimal efforts to buy and sell houses in order to increase their income. He characterizes Lynn as a spendthrift, who lived off of the profits from Dickerson Tire, but contributed basically nothing to the business.
 

 ¶ 23. The supreme court’s decision in
 
 Ferguson
 
 sets forth the proper framework for property designation and distribution. Chancellors are directed to (1) classify the parties’ assets as marital or separate; (2) determine the value of those assets; (3) divide the marital estate equitably based upon the factors set forth in
 
 Ferguson;
 
 and (4) consider the appropriateness of alimony if either party is left with a deficiency.
 
 Larue v. Larue,
 
 969
 
 *644
 
 So.2d 99, 104 (¶ 11) (Miss.Ct.App.2007) (citing
 
 Ferguson,
 
 639 So.2d at 928-29). The
 
 Ferguson
 
 factors include:
 

 (I) contribution to the accumulation of property, (2) dissipation of assets, (3) the market or emotional value of assets subject to distribution, (4) the value of assets not subject to distribution, (5) the tax and economic consequences of the distribution, (6) the extent to which property division may eliminate the need for alimony, (7) the financial security needs of the parties, and (8) any other factor that in equity should be considered.
 

 Hults v. Hults,
 
 11 So.3d 1273, 1281 (¶ 36) (Miss.Ct.App.2009) (citing
 
 Ferguson,
 
 639 So.2d at 928-29). In applying the
 
 Ferguson
 
 factors, chancellors should consider each party’s marital fault.
 
 Singley v. Singley,
 
 846 So.2d 1004, 1013-14 (¶ 26) (Miss.2002). Furthermore, there is a presumption that “the contributions and efforts of the marital partners, whether economic, domestic or otherwise are of equal value.”
 
 Hemsley v. Hemsley,
 
 639 So.2d 909, 915 (Miss.1994).
 

 ¶ 24. In applying the
 
 Ferguson
 
 factors, chancellors must support their decisions with findings of fact and conclusions of law.
 
 Goellner v. Goellner,
 
 11 So.3d 1251, 1263 (¶ 44) (Miss.Ct.App.2009) (citation omitted) (citing
 
 Ferguson,
 
 639 So.2d at 929). In reviewing these findings, we do not conduct a
 
 Ferguson
 
 analysis anew.
 
 Goellner,
 
 11 So.3d at 1264, 1266 (¶¶ 45, 52). Rather, we examine the chancellor’s judgment as well as the record to ensure that the chancellor applied the correct legal standard and did not commit an abuse of discretion.
 
 Id.
 

 ¶ 25. Here, the chancellor was presented with the difficult task of equitably dividing the property. Jeff and Lynn agreed upon the classification and valuation of many items of property, but submitted others for the chancellor to decide. The chancellor thoroughly analyzed the facts and applicable law in a sixty-one page final judgment. Twenty-one of these pages are devoted solely to issues related to property division. The chancellor ultimately ordered an equitable division and awarded an unequal sum favoring Lynn, which Jeff argues was error. After reviewing the record, we cannot say that the chancellor’s decision was manifestly wrong or clearly erroneous.
 

 ¶ 26. Jeffs argument primarily rests on the assumption that his efforts in accumulating marital property were greater than Lynn’s. Jeff suggests that Lynn spent much of her time gambling and made no contribution to the marriage. He also contends she failed to build her real-estate practice to assist Jeff in paying bills. In fact, at trial, Jeff testified that Lynn never worked with him at Dickerson Tire, and she contributed nothing to the operation of the business.
 

 ¶ 27. However, testimony by both Lynn and Brasfield contradicted Jeffs characterization of Lynn’s efforts. According to Lynn, she worked thirty hours per week and made significant contributions to the operation of Dickerson Tire by performing “whatever needed to be done.” Brasfield agreed that Lynn performed “pretty much everything ... except for the actual physical work on the vehicles.” These tasks included answering the phone, taking payments, paying creditors, as well as assisting customers and placing orders for them. Several witnesses testified Lynn secured newspaper and television advertisements for the business. Although Jeff alleges Lynn did not adequately utilize her status as a licensed realtor to contribute income, the chancellor heard evidence that Lynn had little time to devote to her realty practice given the amount of time she spent working for Dickerson Tire.
 

 
 *645
 
 ¶ 28. In any event, contribution to the accumulation of marital property is but one factor to be assessed in the overall
 
 Ferguson
 
 analysis. Another factor is each party’s assets not subject to equitable distribution. Our case law makes clear that
 
 Ferguson
 
 is to be applied in light of each party’s non-marital property.
 
 Welch v. Welch,
 
 755 So.2d 6, 9 (¶ 19) (Miss.Ct.App.1999). For example, in
 
 Welch,
 
 we found no reversible error where a chancellor awarded two-thirds of the marital estate to a spouse based primarily on the fact that the other spouse owned a substantial separate estate.
 
 Id.
 
 at 8-10 (¶¶ 10, 19, 25).
 

 ¶ 29. Here, the chancellor recognized Dickerson Tire was a substantial non-marital asset owned by Jeff.
 
 [2]
 
 The parties agreed that the business had a value of $300,000 and an equitable value of $215,065.42 at the time of the parties’ separation. Thus, Jeffs separate estate is of considerable value given the parties’ overall assets.
 
 [3]
 
 There is a substantial disparity between Jeffs and Lynn’s separate estates given that Lynn has no separate estate.
 
 [4]
 
 Without going into an exhaustive list of all the chancellor’s
 
 Ferguson
 
 findings, we also point out that the chancellor noted Jeffs marital fault — his adulterous relationship prior to the parties’ separation — and trial testimony that Lynn performed household duties such as cleaning.
 

 ¶ 30. This Court has held that chancellors need not divide the marital estate equally when ordering an equitable division.
 
 See, e.g., Goellner,
 
 11 So.3d at 1264 (¶ 45) (citation omitted). Indeed, an unequal division may be appropriate under certain circumstances. After reviewing the chancellor’s findings and the record, we find the chancellor acted well within her discretion in applying
 
 Ferguson.
 
 Accordingly, we decline to disturb her findings on this issue.
 

 III. Lump-Sum Alimony
 

 ¶ 31. The chancellor ordered Jeff to pay $10,096.02 in lump-sum alimony. This is the exact amount owed on Lynn’s 2001 Lexus vehicle, which she drove during the marriage. Jeff argues this award was inappropriate because: the marriage was short; Lynn possesses a real-estate license; and Lynn has been living with a man who is providing for her.
 

 ¶ 32. The decision of whether to award alimony and the amount of the award are matters left to the chancellor’s discretion.
 
 Lofton v. Lofton,
 
 924 So.2d 596, 599 (¶ 12) (Miss.Ct.App.2006) (citing
 
 Voda v. Voda,
 
 731 So.2d 1152, 1154 (¶ 7) (Miss.1999)). Lump-sum alimony is used as a tool to prevent unfair property division.
 
 See Ferguson,
 
 639 So.2d at 926. This type of alimony has also “been described as a method of dividing property under the guise of alimony.”
 
 Id.
 
 (citations omitted). Thus, a lump-sum award may be necessary where the marital property is not easily divided between the parties.
 
 Cf. Haney v. Haney,
 
 907 So.2d 948, 955 (¶ 29) (Miss.2005)
 
 (“Haney III
 
 ”). Further, a lump-sum award “is a final settlement, not subject to modification.”
 
 Hubbard v. Hubbard,
 
 656 So.2d 124, 130 (Miss.1995).
 

 
 *646
 
 ¶ 33. Past cases have required chancellors to apply the
 
 Cheatham
 
 factors to determine whether lump-sum alimony is appropriate.
 
 See, e.g., Davis v. Davis,
 
 832 So.2d 492, 499 (¶ 26) (Miss.2002);
 
 White v. White,
 
 868 So.2d 1054, 1058 (¶ 9) (Miss.Ct.App.2004). The
 
 Cheatham
 
 factors include:
 

 1) Substantial contribution to accumulation of total wealth of the payor either by quitting a job to become a [homemaker], or by assisting in the spouse’s business.
 

 2) A long marriage.
 

 3) Where [the] recipient spouse has no separate income or the separate estate is meager by comparison.
 

 4) Without the lump[-]sum award the receiving spouse would lack any financial security.
 

 Cheatham v. Cheatham,
 
 537 So.2d 435, 438 (Miss.1988) (internal citations omitted).
 

 ¶ 34. In the present case, the chancellor applied these factors. As to the first factor, the chancellor noted: Lynn quit her job she held at the time of the parties’ second marriage; the parties agreed Lynn would help Jeff operate Dickerson Tire; Jeff testified Lynn promised him she would become a successful real-estate agent but stopped pursuing this goal; the evidence supported that Lynn in fact helped Jeff operate Dickerson Tire; there was no evidence or testimony regarding the effect Lynn’s work at Dickerson Tire had on Jeffs accumulation of wealth; and Lynn was employed with a real-estate firm during the marriage. The chancellor weighed this factor neutrally in her analysis of lump-sum alimony. As to the second factor, the chancellor found the parties’ three-year marriage prior to their separation also weighed neutrally. On the third factor, the chancellor noted: Lynn had a current real-estate license; Jeff testified that Lynn was “less than motivated” in performing her real-estate work; Lynn’s income is totally based on commissions and fluctuates partly based upon the real-estate market and partly based on her personal efforts; and Lynn’s separate income was significantly less than Jeffs. The chancellor weighed this factor in favor of awarding Lynn lump-sum alimony. As to the fourth factor, the chancellor pointed out that the evidence showed: Lynn had no savings or retirement accounts; she is totally provided for by Wade; Lynn could be “left without a roof over her head at the whim of Mr. Wade”; Jeffs separate estate is valued at $215,065.42; and Lynn has no separate estate. The chancellor weighed this factor in favor of awarding lump-sum alimony. Based on these findings, the chancellor concluded that the balance of equities favored awarding lump-sum alimony. She ordered Jeff to pay lump-sum alimony to Lynn in the amount of $10,-096.02 — the remaining balance owed on the 2001 Lexus that was awarded to Lynn.
 

 ¶ 35. Recently, our supreme court in
 
 Haney III
 
 explained the
 
 Cheatham
 
 factor test is an antiquated version of
 
 Ferguson
 
 ⅛ equitable division factors:
 

 Clearly, the
 
 Cheatham
 
 factors were simply an earlier attempt by this Court to provide a chancellor with guidelines for awarding what today is called an equitable distribution of marital assets, under appropriate circumstances. Indeed, we see no
 
 Ferguson
 
 factor which would be inappropriate in evaluating lump[-]sum alimony. Although we continue to refer to certain payments as “lump[-]sum alimony,” these payments are really no more than equitable distribution in the form of lump[-]sum cash, rather than an equitable portion of certain property which cannot be divided equitably.
 

 Haney III,
 
 907 So.2d at 955 (¶ 26).
 
 Haney III
 
 explained lump-sum alimony is closely tied to equitable distribution, and it is really nothing more than equitable distribution
 
 *647
 
 in the form of cash. In addition, the supreme court observed the
 
 Ferguson
 
 factors have essentially consumed the
 
 Cheat-ham
 
 factors.
 
 [5]
 

 ¶ 36. The supreme court later reaffirmed its
 
 Haney III
 
 holding in
 
 Yelverton v. Yelverton,
 
 961 So.2d 19, 25 (¶¶ 8-9) (Miss.2007). In evaluating the chancellor’s lump-sum award, the
 
 Yelverton
 
 majority found “the
 
 Ferguson
 
 factors should now be set forth and applied in all appropriate situations.”
 
 Id.
 
 at (¶ 9). Since the chancellor in
 
 Yelverton
 
 failed to apply the
 
 Ferguson
 
 or
 
 Cheatham
 
 factors, the supreme court reversed on the issue of lump-sum alimony and remanded the case with instructions for the chancellor to apply
 
 Ferguson. Yelverton,
 
 961 So.2d at 26 (¶¶ 10-11).
 

 ¶ 37. The supreme court has further instructed it is improper to award lump-sum alimony “based upon nothing more than one spouse’s need and the other’s ability to pay.”
 
 Haney III,
 
 907 So.2d at 955 (¶ 28). Rather, “[m]ore justification is needed. That is why the
 
 Cheatham
 
 factors and the
 
 Ferguson
 
 factors were provided.” I
 
 d.
 

 ¶ 38. Here, the chancellor made findings of fact and conclusions of law, applying the
 
 Cheatham
 
 factors. The chancellor’s analysis was thorough. Notably, in awarding lump-sum alimony to Lynn, the chancellor considered the disparity in the parties’ respective incomes; Jeffs significant separate estate compared to Lynn’s non-existent separate estate; and Lynn’s lack of financial security in part because she has no savings or retirement accounts. We cannot say that the chancellor manifestly erred in her determination on the issue of lump-sum alimony.
 

 ¶ 39. Having considered the supreme court’s recent decisions in
 
 Haney III
 
 and
 
 Yelverton,
 
 we point out that chancellors should analyze the
 
 Ferguson
 
 factors (which necessarily include the
 
 Cheatham
 
 factors) in awarding lump-sum alimony. However, our precedent supports that failure to apply
 
 Ferguson
 
 is not reversible error where
 
 Cheatham
 
 is applied, and the award is supported by substantial evidence.
 
 See, e.g., Davis,
 
 832 So.2d at 499-500 (¶¶ 26-29). Such is the case here. We decline to disturb the chancellor’s lump-sum alimony award under our limited standard of review.
 

 IV. Attorneys’ Fees
 

 ¶ 40. The chancellor ordered Jeff to pay Lynn’s attorneys’ fees, which totaled $15,056.39. Jeff had already paid almost half of these fees as of the date of the divorce judgment. In the judgment, the chancellor ordered Jeff to pay the remaining balance. The chancellor ordered the majority of these attorneys’ fees to be paid from the sale of the parties’ real-estate properties, with Jeff paying the amount remaining ($2,013.41) after the real-estate proceeds were applied to Lynn’s award of attorneys’ fees.
 

 ¶ 41. Jeff does not take issue with the hourly rate charged by Lynn’s attorneys. Instead, he argues the number of hours logged by her attorneys was excessive.
 
 [6]
 
 Specifically, he claims the divorce case was simply a continuation of prior temporary matters. He contends many of the same issues were presented, and Lynn’s attorneys spent too much time on the divorce
 
 *648
 
 litigation. Jeff also argues the chancellor should have considered the factors in
 
 McKee v. McKee,
 
 418 So.2d 764 (Miss.1982), in determining the proper amount of the award.
 

 A. Amount of the Award
 

 ¶ 42. Here, the parties stipulated that the items billed by Lynn’s attorneys were legitimate, and the amount was reasonable.
 
 [7]
 
 Matters stipulated at trial are procedurally barred from being appealed.
 
 See State ex rel. Holmes v. Griffin,
 
 667 So.2d 1319, 1327 (Miss.1995). Accordingly, Jeff has waived any argument as to the amount billed by Lynn’s attorneys. However, we will address the chancellor’s award.
 

 ¶ 43. An award of attorneys’ fees is a matter largely within the sound discretion of the chancellor.
 
 Smith v. Smith,
 
 614 So.2d 394, 398 (Miss.1993). Appellate courts are reluctant to disturb a chancellor’s discretionary determination of whether to award attorneys’ fees.
 
 Id.
 
 They are also hesitant to second guess the amount of any award.
 
 Id.
 
 This is especially true in divorce cases where chancellors have wide authority and discretion in setting appropriate attorneys’ fees.
 
 Hartley v. Hartley,
 
 317 So.2d 394, 395 (Miss.1975).
 

 ¶ 44. Attorneys’ fees should only be awarded in an amount that compensates for services rendered.
 
 McKee,
 
 418 So.2d at 767. The fees must be fair to all concerned after determination that the legal work was reasonably required and necessary.
 
 Id.
 
 Chancellors should apply the following factors in determining the proper amount of the award:
 

 [A] sum sufficient to secure [a] competent attorney is the criterion by which we are directed. The fee depends on consideration of, in addition to the relative financial ability of the parties, the skill and standing of the attorney employed, the nature of the case and novelty and difficulty of the questions at issue, as well as the degree of responsibility involved in the management of the cause, the time and labor required, the usual and customary charge in the community, and the preclusion of other employment by the attorney due to the acceptance of the case.
 

 Id.
 
 (internal citation omitted).
 

 ¶ 45. Jeff does not address all the
 
 McKee
 
 factors, but primarily argues: (1) the case did not involve novel or difficult questions, and (2) Lynn was financially able to pay. We agree that some of the same issues were undoubtedly revisited in the divorce matter. But we do not view this case as a routine continuation of the temporary matters. The divorce hearing itself spanned four days and involved calling multiple witnesses. The chancellor also required both parties to submit briefs in support of their positions. Though some issues were agreed upon, many issues were contentiously debated. Notably, each party asserted multiple acts by the other allegedly constituting fault-based grounds for divorce.
 

 ¶ 46. In addition, there is ample support in the record that Lynn is not finan
 
 *649
 
 cially capable of paying her attorneys’ fees. The record shows that Lynn worked for Dickerson Tire for the entirety of the marriage for no salary, and she was heavily dependent on Jeff to provide for her. Also, Lynn testified that she had difficulty generating her own independent income in her real-estate practice due to Jeffs actions. Specifically, Lynn alleged Jeff had stolen her 2001 Lexus vehicle, which deprived her of a means of transportation to her real-estate job. Lynn testified that for this reason, she was unable to work for much of 2006 and during the early part of 2007. According to Lynn, she earned about $8,700 for the entire year of 2007 and generated about $1,000 per month during the months she had transportation.
 

 ¶ 47. Furthermore, some of the attorneys’ fees were generated during proceedings in which Jeff was found in contempt of a court order to pay temporary support. As our precedent makes clear, attorneys’ fees are properly assessed against a party found to be in contempt.
 
 Mount v. Mount,
 
 624 So.2d 1001, 1005 (Miss.1993). Moreover, the chancellor noted that Jeff engaged in dilatory tactics throughout the litigation, such as having two restraining orders issued against Lynn under questionable circumstances. There was also evidence that Jeff may have concealed assets, as various items of personal property last known to be in Jeffs possession were unaccounted for. Such wrongful conduct has been held to support an award of attorneys’ fees.
 
 Merideth v. Merideth,
 
 987 So.2d 477, 485 (¶¶ 29-30) (Miss.Ct.App.2008) (citing Miss.Code Ann. § 11-55-5(1) (Rev. 2002));
 
 Myers v. Myers,
 
 741 So.2d 274, 281 (¶ 31) (Miss.Ct.App.1998) (citing
 
 Pittman v. Pittman,
 
 652 So.2d 1105, 1111 (Miss.1995)).
 

 ¶ 48. For these reasons, we find the chancellor did not manifestly err in crafting the attorneys’ fees award.
 

 B. McKee Findings
 

 ¶ 49. As already stated, chancellors are instructed to apply the
 
 McKee
 
 factors in granting or denying attorneys’ fees. The chancellor did not cite
 
 McKee
 
 itself in her final judgment, but she did cite
 
 Baldwin v. Baldwin,
 
 788 So.2d 800, 807 (¶ 19) (Miss.Ct.App.2001), in which this Court recited the
 
 McKee
 
 factors. Although the chancellor addressed the applicable law, she did not make specific findings regarding the
 
 McKee
 
 factors. However, where there is substantial evidence in the record supporting the chancellor’s award of attorneys’ fees, the omission of specific findings cannot be deemed reversible error.
 
 See Varner v. Varner,
 
 666 So.2d 493, 498 (Miss.1995) (no
 
 McKee
 
 findings);
 
 Prescott v. Prescott,
 
 736 So.2d 409, 416 (¶ 31) (Miss.Ct.App.1999) (no finding of inability of recipient to pay). As previously discussed in detail, substantial evidence supports the chancellor’s award.
 

 ¶ 50. We note also that a specific, on-the-record finding of inability to pay is not necessary where attorneys’ fees are awarded due to the other party’s failure to comply with discovery requests.
 
 Russell v. Russell,
 
 733 So.2d 858, 863 (¶ 16) (Miss.Ct.App.1999). A specific finding of inability to pay is also not required when attorneys’ fees are assessed against a party found to be in contempt.
 
 Mount,
 
 624 So.2d at 1005. The chancellor specified her award included “not only the amount usually incurred during a fault[-]based divorce, but also additional fees associated with [Jeffs] refusal to cooperate with the discovery process.” The chancellor also found Jeff in contempt for violating a court order to pay temporary support.
 

 ¶ 51. For these reasons, this assignment of error is without merit.
 

 
 *650
 
 ¶ 52. THE JUDGMENT OF THE CHANCERY COURT OF WARREN COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ„ CONCUR.
 

 [1]
 

 . We note that our standard of review is de novo where a chancellor fails to make such findings.
 
 Brooks v. Brooks,
 
 652 So.2d 1113, 1117 (Miss.1995);
 
 see also Curtis v. Curtis,
 
 796 So.2d 1044, 1049 (¶ 16) (Miss.Ct.App.2001) (citing
 
 Brooks, 652
 
 So.2d at 1117-19). Because the chancellor made specific findings of fact in this case, we must apply our deferential manifest-error standard.
 

 [2]
 

 . Dickerson Tire was owned by Jeff for years prior to the marriage. The parties do not challenge the chancellor’s determination that Dickerson Tire was Jeff’s separate property.
 

 [3]
 

 . The chancellor determined that the total market value of the parties' assets subject to equitable distribution was $86,541.30.
 

 [4]
 

 . We note the chancellor determined that multiple items of personal property that could not be located were Lynn’s separate property.
 

 [5]
 

 . As an illustration of this point, the supreme court provided a chart with a side-by-side comparison of the
 
 Ferguson
 
 and
 
 Cheatham
 
 factors.
 
 Haney III,
 
 907 So.2d at 954 (¶ 25).
 

 [6]
 

 . Jeff states in his appellate brief: "The hourly rate was within the usual[J customary charge in the community. Appellant takes no issue[J with the rate, just the time that was presented."
 

 [7]
 

 . At trial, Jeffs attorney stated: "I have no objection to the time [Lynn’s] attorneys spent on [the litigation] ... or [to] the rate that [they] charge[ ]....” Jeffs attorney later stated:
 

 I stipulate ... —Your Honor, that the items indicated on the bill were performed by [Lynn's attorneys], [but] I cannot stipulate that any of that was caused by my client. And so, as to the ... items of the bill, I would suggest to the Court that those have been legitimate items, but would deny that my client is responsible for any of that. And I also would stipulate that the fee charged, [Lynn’s attorneys’! hourly rate[,] is reasonable.